## Richmond

### D. B. Wiltshire, Jr., and E. A. Wiltshire, Individually and as Executors of the Estate of D. B. Wiltshire, Deceased

### v.

### H. R. Pollard, III, Individually and Trading as Speaker Pollard and Associates and United Plans Limited Partnership

January 11, 1980.

Record No. 771770.

Present: All the Justices.

*Walter R. Gambill* (*Gambill & Martin,* on brief), for appellants.
*Henry R. Pollard, IV* (*T. Lee Brown, Jr.; Parker, Fenderson, Pollard & Press, Inc.,* on brief), for appellees.

HARRISON, J., delivered the opinion of the Court.

D. B. Wiltshire, Jr., and E. A. Wiltshire, executors and beneficiaries of the estate of their father, Donald B. Wiltshire, deceased, allege that the estate is entitled to one-third of the one-fourth interest of H. R. "Speaker" Pollard, III, in United Plans Limited Partnership. The principal asset of the partnership is a valuable tract of land on Parham Road in Richmond. The commissioner in chancery found in favor of the Wiltshires. His report was set aside by the trial court and final judgment entered for Pollard. We must therefore review the evidence to ascertain whether, under a correct application of the law, the evidence supports the findings of the commissioner or the conclusions of the trial court. *Martinsville Bank* v. *Cobler,* 215 Va. 852, 854, 213 S.E.2d 800, 802 (1975); *Parkes* v. *Gunter & Byrd,* 168 Va. 94, 98, 190 S.E. 159, 160 (1937).

Speaker Pollard and Donald Wiltshire had worked together in the real estate business from 1919 until Wiltshire's death in 1969, "without a shred of a written agreement or without any discernible pattern of what they were doing or how they were sharing profits, except in the cases of commissions on the sales of real estate, which was their main business," as the chancellor noted. Pollard owned all the stock of Speaker Pollard and Associates, Inc., and made loans to the corporation whenever it needed funds. While occasionally there were other salesmen who worked out of the office, Pollard and Wiltshire by and large conducted the business, which consisted of selling real estate on commission. Wiltshire shared in the commissions, but he received no salary and was regarded as self-employed. The commissions on sales were generally distributed, one-third to Wiltshire and two-thirds to the corporation, although this distribution was sometimes varied. The relationship between the two men, obviously one of affection and mutual respect, continued until the death of Wiltshire. In recent years Pollard suffered from cerebral arteriosclerosis and senility and was unable to testify competently in the case. His attending physician, Dr. Thomas Davis, said: "I don't think the man right now can testify to anything being fact, in my judgment. I'm not sure he could tell you what year it is. . . what street he lives on. . . ." The accuracy of this appraisal of Pollard's condition is apparent from the testimony that he attempted to give before the commissioner.

Pollard's withdrawals of income from the corporation depended upon his personal requirements and were made after payment of the expenses incident to the operation of the business. After Wiltshire's death the decedent's estate was paid his share of commissions on

transactions that were pending at the time of his death. The only item in controversy is the "Parham Road transaction."

The background of the Parham Road property involves the Severine G. Leoffler, Sr., family, whose principal business was the design and development of golf courses. Leoffler, Sr., who had developed a close friendship with Speaker Pollard, acquired Richmond property, known as Windsor Court Apartments. His son, Severine G. Leoffler, Jr., testified that during the 1960's his father became enthusiastic over a tract of land in Richmond, and that he met with Pollard many times regarding the property. He said that United Plans, Inc., was organized to acquire and take title to the property from Thomas M. Brooks Lumber, Co., Inc.[1] Two of Leoffler's sons, Severine, Jr., and Layne E., and Pollard were the common stockholders, the brothers each owning a three-eighths interest and Pollard a two-eighths interest. The brothers paid $300 each for their stock, and Pollard paid $200. Leoffler, Sr., was the owner of all the preferred stock, then valued at $110,000.

The property was acquired in the following manner: Leoffler, Sr., conveyed his Windsor Court Apartments to United Plans, Inc., in exchange for all the preferred stock in the corporation; United Plans, Inc., then exchanged the Windsor Court Apartments for the Parham Road property owned by the Brooks Lumber Co., and executed its notes to Brooks for the difference in the agreed purchase prices. Simultaneously Brooks sold the apartments to Wayne Freeland, a sale which resulted in $6,525 in realty commissions, of which $3,262.50 was to be paid to Speaker Pollard and Associates, Inc., and the balance to a co-broker. At the time of the sale by Brooks to Freeland, it was necessary for each of the two real estate firms to lend Freeland $5,000 in order for the transaction to be closed. These amounts were ultimately repaid by Freeland. Although Speaker Pollard and Associates, Inc., had not then received in cash its share of the commissions, on May 19, 1961, Pollard personally made Wiltshire a loan or advance of $1,000. On August 31, 1961, Speaker Pollard and Associates, Inc., gave Wiltshire its check in the amount of $1,000, reciting on the face thereof, "payment in full for the Brooks, Leoffler and Freeland Transaction." Wiltshire, in turn, endorsed this check to Speaker Pollard in repayment of the $1,000 loan.

The Wiltshires claim, and the commissioner agreed: that their father

[1] The transaction occurred in May 1961. The land involved, commonly referred to as the Parham Road tract, consisted of approximately 230 acres, then described as lying north of Darracott Road between Woodman Road and Hungary Road in the Brookland District of Henrico County, Virginia.

should have received $1,087.50 instead of $1,000 for his share of the commissions paid incident to the Windsor Court Apartments sale by Brooks to Freeland; that no commissions were paid at that time on the remainder of the transaction which involved the Parham Road tract; that Wiltshire had a one-third interest in Pollard's one-fourth interest in United Plans, Inc.; and that Wiltshire's claim to further compensation was not forfeited by his acceptance of the $1,000 check with the "in full" notation thereon.

Pollard's position is that Wiltshire was not involved in any manner in the transaction which resulted in the acquisition by the Leofflers of the Parham Road property and the organization of United Plans, Inc., or thereafter the forming of the limited partnership.

Following the death of Donald Wiltshire, his two sons sought to determine the extent of their father's holdings, particularly his entitlement to any unpaid commissions from Speaker Pollard and Associates, Inc., and his interest in the Parham Road property. In March 1970, the Wiltshire heirs were advised in writing by Speaker Pollard that their father's estate was entitled to one-third of all remunerations received by Speaker Pollard and Associates from three specific transactions which he identified. The Parham transaction was not included.

E. A. Wiltshire testified that the arrangement between his father and Pollard called for payment of one-third of all commissions earned by Speaker Pollard and Associates to his father, one-third to Pollard, and one-third to cover office expenses. He had knowledge of the Windsor Court Apartments conveyance to United Plans, Inc., and its subsequent sale to Freeland, and the conveyance by Brooks Lumber Co. of the Parham Road property to United Plans, Inc. He said that his "daddy was very, very proud of the fact that he was involved in this transaction." He testified that his father took him to the Parham Road property on an average of "at least once and most of the time it was twice a month," and that "he [the father] felt so proud that one of these days they would acquire a lot of money from it when it was sold." Wiltshire further testified that he was present in the Pollard office on many occasions when Jack Mann, a salesman then connected with the company, "joked and kidded" his father, saying that when the property was sold his father would realize so much money that they were going to "get him to buy a big Cadillac Fleetwood Sedan." He said Speaker Pollard was present and also "kidded" his father about the money.

This witness testified that after his father's death he found two books in which the deceased had made various notes concerning his private life and also his business activities. On a page, dated May 29,

1962, in one of the books, and in the father's handwriting, is the following note: "If anything happen [*sic*] to me I have an interest in the land back of the Dooley Orphanage, Washington highway. We have 1/4 interest in the profits and I get one-third of this 1/4. This deal was made on the Windsor Court apartments and two homes, and we put all of the commissions in the deal. I am sure Speaker will be fair. I also have 1/3 interest in the jeep. D. B. Wiltshire." On the margin of the page, also in the father's handwriting, is a notation, "Mr. Tom Brooks." Admittedly, this writing refers to the Parham Road property.

The other book, entitled "1967 Year Book," related to commissions that Wiltshire, Sr., had received or expected to receive on various transactions which he and Pollard had made. On a page headed "Sat/ Sun, Apr 29-30" is the notation, "land in north Richmond on Parham road we have 1/4 ins [*sic*] I get 1/3 of the fourth."

The Wiltshires also introduced in evidence a diary, kept by their mother, Mrs. Donald B. Wiltshire, who died in 1962. In this book is an entry which reads as follows: "March 30—Washington, D. C.— Mr. Leftner [*sic*]—Mr. Brooks deal—Speaker." Again, on April 12, 1961, Mrs. Wiltshire's diary reads: "Washington D.C.—Mr. Leftner [*sic*]—About Lakeside Land—Tom Brooks—Speaker."

The plaintiffs testified that after their father's death they discussed the Parham Road property with Speaker Pollard "on many, many occasions." E. A. Wiltshire said that the first time they approached him, "Speaker told Brother and I [*sic*] that he had not decided exactly what he was going to do or precisely what he was going to do, that he thought that he would merely deduct any cost that had been incurred by him in connection with this property and pay us whatever profits would be derived from the sale of the property"; that on another occasion he discussed the Parham property matter with Speaker Pollard in his home with Mrs. Pollard present, and that "she yelled at Speaker and said, 'Speaker, I told you that something like this would happen eight years [ago]' "; and that Mr. Pollard twice told his wife to "get out."

Wiltshire testified that at all times after his father's death and until March of 1972, the meetings with Speaker Pollard were most amicable and that on each occasion "Speaker assured Brother and I [*sic*] that we would share and get everything that we were entitled to on the Parham Rd. property." When the Wiltshires sought to get a written statement from Speaker Pollard of their father's interest in the Parham Road property and its value, he stated that Pollard said he was going to see that they did get a statement as to their share in the future profits on the property, and that in February 1972, when he

and his brother made a final effort to obtain the statement, he said that Speaker Pollard stood up at his desk and said, "Well, damn it, I'll see to it that you do get a statement. I'll get Harry to draw up the papers."

Thereafter, on March 6, 1972, E. A. and D. B. Wiltshire, Jr., received from Speaker Pollard's son, Harry R. Pollard, IV, counsel for defendants, a letter addressed to them, which reads as follows:

> Daddy has talked with me concerning your conversations with him in regard to your father's interest in the property located on Parham Road. He has also shown me a letter dated February 19, 1972, which was presented to him for executing acknowledging that your father had an interest in the property located on Parham Road.
>
> I have discussed this matter with my father and he has informed me that he wishes for you to talk with me in the future concerning any discussion of this matter. Daddy has informed me that his position all along has been that your father had no interest in the property and this continues to be his position. I will be happy to talk with you at any time concerning this.

Wiltshire testified that this letter was the first indication by Pollard that their father was not entitled to a one-third share in Pollard's interest in the Parham Road property, and that, on the contrary, Pollard had promised repeatedly that they "would be taken care of" and would receive "every penny that was due Donald on the deal."

Donald B. Wiltshire, Jr., testified that he and his brother inquired of Mrs. Gladys C. Toom, the company's former bookkeeper, if Donald Wiltshire was involved in the Parham Road "deal." He said she responded that he had been involved but she thought that their father had sold his interest and that there was a signed release in the office records. Thereafter, Mrs. Toom testified and denied making any statement to the Wiltshires that their father had any interest in the Parham Road property. On the contrary, she said, "I do remember Mr. Wiltshire never owned any part of United Plans. I've always known that."

Mrs. Donald B. Wiltshire, Jr., testified that while her father-in-law was in the hospital, he was visited frequently by Speaker Pollard, and that on ten or twelve occasions she was present when Wiltshire would say to Pollard, "Don't forget, Speaker, I share in the Parham deal," and that Speaker always answered by saying, "I know, I know, Donald," shaking his head up and down. She stated that on those occasions Pollard would always agree with Wiltshire.

The corporation, United Plans, Inc., was dissolved and supplanted by United Plans Limited Partnership, consisting of Severine G. Leoffler, Jr., Layne E. Leoffler, Sr., and H. R. "Speaker" Pollard, III. In 1971, the limited partnership sold 105 acres of the Parham Road land to the County of Henrico for $540,000, and in 1972, the partnership sold 55.06 acres thereof to Robert B. Ball for $550,600.

Testimony on behalf of Speaker Pollard and the Partnership was provided by Severine G. Leoffler, Jr., Mrs. Gladys Collins Toom, Lawrence I. Briel, and Mrs. Esther Nichols Pollard. Leoffler testified in great detail about the manner in which his father became involved in Richmond real estate, the intimate personal relationship that existed between his father and Speaker Pollard, and the high regard his father had for Pollard. He gave the background and the details incident to the Parham Road property, its acquisition, the organization of United Plans, Inc., and the forming of the United Plans Limited Partnership. Leoffler gives Speaker Pollard full credit for the profitable manner in which the property has been handled. He said, "In other words, this was part of his share of the—of owning one-quarter of the property. He would manage it, sell it and there would be no commissions paid." Leoffler testified that a tremendous amount of time and effort was invested by Pollard in developing the property and in negotiating with the various governmental agencies involved. When asked if Wiltshire had any interest in United Plans, Inc., or in the Limited Partnership, Leoffler responded: "Positively not. . .there was no way that he [Wiltshire] in any way could be participating." Specifically, this witness testified that the Leofflers would not have considered anyone other than Pollard as an associate in the Parham Road transaction and "wouldn't have considered him [Wiltshire] under any way, shape or form."

Mrs. Toom was employed by Speaker Pollard and Associates, Inc., from 1954 through 1966 as bookkeeper and secretary. She said that she was familiar with the affairs of the corporation, of United Plans, Inc., and of the relationship that existed between Speaker Pollard and Donald Wiltshire. She testified that Wiltshire worked on a commission basis and that after his share of the commission on any specific sale was paid to him by the corporation, the balance was left in the corporation's account. She said that Pollard would withdraw funds from this account whenever he needed to do so. She considered Mr. Pollard to be "the backbone of the corporation" and was emphatic in her testimony that Wiltshire did not work on the Parham Road purchase and that he had no stock or interest in United Plans, Inc.

Lawrence Briel was associated with Speaker Pollard and Associates

from 1963 to 1969 as a real estate salesman, working on a commission basis. He testified that he was unaware of any private agreement between Wiltshire and Pollard, and that although he worked in the office during the period in which the Parham Road property was being developed, he overheard nothing to indicate that anybody other than the Loefflers and Pollard had anything to do with the property.

Mrs. Esther N. Pollard, wife of Speaker Pollard, testified that she worked in the corporation's office after Mrs. Toom left and the records of the business indicated that no one other than the Leofflers and her husband had any interest in the property in controversy. She said that she was present on an occasion when the two Wiltshire brothers talked to her husband about their interest in the Parham property. She stated that she was uncomfortable because she knew that they had no interest, and her husband did not make it clear to the brothers that they had no interest. She said it was obvious to her that the Wiltshires thought they did have an interest and she wanted her husband to say, "Yes, you do, or No, you don't. And he wasn't saying that."

█ The dispositive issue in this case is whether the plaintiffs established by clear and convincing evidence a resulting trust in favor of Donald B. Wiltshire in the shares of common stock in United Plans, Inc., issued to H. R. "Speaker" Pollard, III. Neither the testimony of Donald B. Wiltshire, who is deceased, nor that of Speaker Pollard, who is incompetent, is available. Therefore, necessary corroboration of plaintiff's evidence is required before a judgment or decree can be entered in their favor. Virginia Code § 8.01-397.

█ In *Salyer* v. *Salyer,* 216 Va. 521, 525-26, 219 S.E.2d 889, 893 (1975), we restated the general principles which control our decision here. We said:

> *Indirect* trusts "arise from the evident *intention* of the parties, or the *nature of the transaction,* although without any *express declaration of trust.*" 1 *Minor on Real Property* §451 at 603 (2d ed. F. Ribble 1928). One class of such trusts is a resulting trust, which is enforceable in equity and may arise without a writing. *Id.* at 603-04. Resulting trusts "include such interests as arise from *presumed intention,* which allots a beneficial ownership to some party other than him in whom is vested the legal title." *Id.* at 604.

█ Although plaintiffs grounded their argument on the theory of a resulting trust, it can be argued that in their bill of complaint they

alleged an express trust. There they claimed that Pollard holds his interest in the limited partnership as trustee for the benefit of plaintiffs "by reason of the business relationship which existed" between him and Wiltshire. However, if we were to assume the trust to be express, the outcome of this case would not be altered. In *Brame* v. *Read,* 136 Va. 219, 221-22, 118 S.E. 117, 118 (1923), the court held:

> That an express trust in land may be set up by parol is perfectly well settled in this State. [Citations omitted.] It is equally true, however, that in order to establish such a trust the declaration must be unequivocal and explicit, and the evidence thereof must be clear and convincing. . . .

The question to be resolved here, therefore, remains one of fact.

In *Walker Agcy. & Aetna Cas. Co.* v. *Lucas,* 215 Va. 535, 540-41, 211 S.E.2d 88, 92 (1975), we defined clear and convincing evidence as:

> [T]hat measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and *unequivocal.*

We will apply these principles and assume, but not decide, that all evidence introduced on behalf of the Wiltshires, some over the objection of the defendants, was admissible.

Of importance in this case is the fact that Pollard was the sole stockholder and owner of Speaker Pollard and Associates, Inc. Wiltshire derived his compensation from commissions on specific sales of real estate. Pollard received what was left after payment of Wiltshire's commission and the expenses of the office and the corporation. The relationship between Wiltshire and the corporation can be described as a joint venture as to each separate sale on which a commission was earned. While most of the time the venture involved only Wiltshire and Speaker Pollard and Associates, other salesmen were sometimes associated with the office and received or shared in the commissions.

Significantly, there is nothing shown by the records of Speaker Pol-

lard and Associates, Inc., which indicates that anyone connected with the office, other than Pollard, had any interest in the Parham Road acquisition by United Plans. Admittedly, a resulting trust may arise without a writing and can arise from *presumed intention*. The questions are: When the Leofflers allowed Pollard to acquire two shares of the common stock in United Plans, Inc., for $200, did Pollard acquire this stock on behalf of Wiltshire (one-third interest) and Speaker Pollard and Associates, Inc., (two-thirds interest), although he took title thereto solely in his individual name? Or, did Pollard acquire the stock solely in his own right? Or, was the relationship between Pollard and Wiltshire such that it can be presumed that the stock was acquired for the benefit of Wiltshire and Speaker Pollard and Associates? The burden is on the plaintiffs to supply the answers by clear and convincing evidence. This burden is a heavy one indeed, made even more so by the death of one principal, the incompetency of the other, and the passage of time.[2]

It is clear that Wiltshire was not known by the Leofflers in the Parham Road transaction. They dealt solely with Pollard, and because of their personal friendship with him, and their respect for his professional expertise, they permitted him to acquire one-fourth of the common stock issued by United Plans, Inc. If the Wiltshires are to establish that their father's estate has an interest in this stock they must look elsewhere than the testimony of Leoffler or the records in the office of Speaker Pollard and Associates. They seek to do so by relying on:

(1) Two memoranda in their father's handwriting, one written in 1962, and the other in 1967, stating that he had an interest in the Parham Road property and expressing the belief that "Speaker will be fair";

(2) A memorandum in the handwriting of their mother from which it might be inferred that in March and April 1961, she and/or her husband may have had some contact with the Leofflers and Speaker Pollard in Washington, D.C., regarding the Parham Road property;

(3) Oral statements allegedly made by Wiltshire to his two sons and daughter-in-law that he had an interest in the Parham Road property;

(4) Vague and inconclusive statements allegedly made by Pollard from which it might be inferred that Wiltshire was to share in or reap some pecuniary benefit from Pollard's ownership of stock in United Plans, Inc.

---

[2] The bill of complaint was filed on August 15, 1975, nearly six years after the death of Donald B. Wiltshire.

The evidence adduced by the plaintiffs does establish that Mr. Wiltshire, Sr., felt that he had, or was entitled to have, or hoped he would receive, some part, share, or interest in the common stock of United Plans, Inc., which was issued to Speaker Pollard in 1961. It is reasonable to surmise that had Mr. Wiltshire lived and had both Wiltshire and Pollard remained in good health, Wiltshire would have reaped some benefit, direct or indirect, from Pollard's ownership of this stock. But this did not occur, and the critical issue remains whether the Wiltshires established their father's resulting trust in the stock by clear and convincing evidence.

Leoffler, Jr., was very positive that no commissions were involved in their acquisition of the Parham Road property from Brooks in exchange for the Windsor Court Apartments. The defendants contend that Pollard's connection with the transaction was not that of a real estate agent making a sale or making an exchange of property for a commission. They say Pollard's role was that of a personal friend of the Loeffler family, one knowledgeable in real estate, who, for these reasons, was accepted as a partner and whose financial reward, if any, depended upon the success of the venture. Leoffler insisted that Wiltshire was not involved in this phase of the transaction. However, there was a sale of property which grew out of the Windsor Court—United Plans—Brooks transaction. It was the apartment sale by Brooks to Freeland, a sale which did generate a commission for Speaker Pollard and Associates, Inc., and in which Wiltshire did share. Although the language on the corporation's check which represents Wiltshire's commission on that sale is not conclusive, it is persuasive. The only transaction that occurred at that time which involved a commission was the Brooks-to-Freeland one, and had the check been intended to cover only this commission it is reasonable to argue that it would have so stated. Instead, the $1000 check of Pollard and Associates professed to encompass not just the transaction involving Brooks to Freeland but "the Brooks, *Leoffler* and Freeland Transaction" and recited that it covered "payment in full."

We attach little significance to the fact that the check was for $1,000 instead of exactly one-third of $3,262.50. The record shows that Speaker Pollard and Associates did not collect its commission in cash at the time the sale from Brooks to Freeland was negotiated. It and the co-broker had to lend Freeland $10,000 in order to consummate the transaction and to earn the commission which was not received until many months later. This fact may explain why the amount paid Wiltshire was $1,000 instead of $1,087.50.

Neither can we ignore the testimony of Mrs. Toom and Mr. Briel.

Both were in the office with Pollard and Wiltshire at or near the time the Parham Road acquisition was made and the United Plans corporation formed. Mrs. Toom remained through 1966 and Mr. Briel through 1969. Both Mrs. Toom and Mr. Briel testified unequivocally that at no time was anything ever said in their presence, or overheard by them, to intimate that anybody had any interest in the Parham Road property other than the Leofflers and Speaker Pollard.

Additionally, the record shows that the account of Speaker Pollard and Associates, Inc., was carried in First and Merchants Bank and that the personal accounts of H. R. "Speaker" Pollard, III, were carried in State Planters Bank and Virginia Trust Company. When Pollard paid for his shares of stock in United Plans, Inc., he did so by personal check on his account in State Planters Bank. Checks that he drew in connection with the incorporation and organization of United Plans, Inc., were also drawn on his personal account. The $1,000 loan, or advance on commissions, that was made Wiltshire by Pollard on May 19, 1961, was evidenced by Pollard's check drawn on his personal account at Virginia Trust Company. The $1,000 "payment in full" check, dated August 31, 1961, was drawn on the account of Speaker Pollard and Associates, Inc., at First and Merchants Bank. It therefore appears that Pollard deliberately kept separate and apart the Parham Road transaction from transactions which involved Speaker Pollard and Associates and Wiltshire.

The only occasion shown when Pollard and Wiltshire acquired real property to be held by them occurred in 1951, and involved land in Surry County. Title to that land was taken in the name of H. R. Pollard, III, trustee. However, at the time this occurred the parties had a written agreement reciting that the trustee held the property in trust for the joint and equal ownership of Pollard, Wiltshire, and two others, and that in event of a sale the proceeds were to be distributed in fourths. It is reasonable to argue that if Pollard and Wiltshire had made an agreement for the joint ownership of the stock in United Plans, Inc., they would have evidenced this agreement by a writing in the same manner and for the same reason they evidenced their ownership of the Surry County property in 1951. Had this been done, the uncertainties that attend a decision of this case would have been obviated.

The trial judge, after a careful consideration of the evidence and argument of counsel, observed:

I might state that I commenced the study of this file in great detail fully conscious of the fact that one who excepts to a

Commissioner's report bears a heavy burden, but the plaintiffs' case must be based upon the evidence and the evidence must meet the requirement of the law, that is, that it be "clear and convincing". At most, I can see from this evidence that perhaps Mr. Wiltshire had an interest in United Plans, or maybe he thought he had an interest, or maybe his wife thought he had an interest, or maybe his sons thought he had an interest, but the evidence does not clearly and convincingly prove that he had an interest, and the ultimate burden of proof is upon the plaintiffs.

The trial court was unable to find clear and convincing evidence sufficient to establish a trust in favor of the Wiltshire estate. Neither can we. Therefore we cannot say that the judgment of the lower court is clearly wrong or without supporting evidence.

*Affirmed.*