## Rebecca J. Weston Wells

### v.

## Willliam J. Weston

Record No. 820677

Decided March 8, 1985, at Richmond

Present: All the Justices

*Timothy J. Hauler (Elliott, DeBoer & Hauler, Ltd.* on brief), for appellant.

*Homer C. Eliades (Eliades, Robertson & Eakin,* on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

In this appeal, we review the ruling of the trial court that a provision for spousal support contained in a property settlement agreement between a wife and husband and also included in a decree awarding the wife a divorce from bed and board was void and unenforceable.

Rebecca J. Weston, now Rebecca J. Wells (Rebecca), and William J. Weston (William), then her husband, executed a property settlement agreement dated August 22, 1974, which contained the following provision:

(2) Husband shall pay to Wife the sum of $500.00 per month as alimony so long as Wife shall live. Such payments shall be made from the estate of Husband should he die

before Wife and shall be a first charge upon the assets of Husband's estate in such event.

A similar provision was included in the *a mensa* divorce decree entered October 29, 1974. On William's petition, this decree was merged into a divorce from the bonds of matrimony by decree entered December 22, 1976. On May 5, 1979, Rebecca remarried; William discontinued the payments to her of $500 per month.

Rebecca filed a bill of complaint in the trial court against William seeking specific performance of the spousal support provision. The cause, consolidated with another proceeding pending in the trial court relating to the same provision for spousal support, was referred to a commissioner in chancery to take evidence and report to the court. Evidence was taken by deposition before the commissioner, but he died before making his report. The court appointed another commissioner who, with the consent of the parties, made a report based upon the evidence taken before his predecessor. The commissioner reported that the property settlement agreement dated August 22, 1974, was "in every respect a legally enforceable contract," and that William had breached the contract by having ceased on May 1, 1979, to make the required payments to Rebecca.

William filed exceptions to the commissioner's report. The trial court, sustaining exceptions as to the provision for spousal support payments, made certain findings of fact included in its decree entered January 19, 1982. The court found that James G. Harrison was employed by Rebecca as her attorney but was a social acquaintance of both Rebecca and William and maintained a business relationship with William; that Harrison prepared the property settlement agreement and the interlocutory decree of divorce; that William paid for Harrison's services as required by the agreement; and that the evidence was in conflict as to what advice, if any, was given by Harrison to William in reference to the spousal support provision, but that William's testimony on this issue was of greater probative value than Harrison's.

The court then found that "[d]espite the absence of actual fraud . . . there exists an overtone of unintentional constructive fraud due to the peculiar relationship of each of the parties to . . . Harrison." Next, the court found that the agreement was lacking in mutuality "in that there was never a meeting of the minds or true 'arms length' dealing between the respective parties." Finally,

the court found that Harrison's conduct "has the appearance of impropriety due to the peculiar nature of the relationship of said attorney to the respective parties."

The court thereupon ordered that the agreement remain in effect except for paragraph (2) and that the decree of October 29, 1974, remain in effect except for the similar provision for spousal support, which the court vacated. Rebecca's petition for rehearing was denied by final decree entered February 9, 1982. On appeal, Rebecca argues that the evidence does not support the court's ruling. Since the commissioner in chancery found in favor of Rebecca and the trial court found in favor of William as to the provision for spousal support, we must review the evidence to determine whether it supports the findings of the commissioner or the conclusions of the trial court. *See Wiltshire* v. *Pollard*, 220 Va. 678, 680, 261 S.E.2d 542, 543 (1980).

In his answer to the bill of complaint and in his testimony William asserted that he was told by Harrison that paragraph (2) was a "routine" provision commonly used in separation agreements. He testified that Harrison told him it was put in the agreement for the protection of the wife. William thought that it was merely a routine clause which would not bind him to pay Rebecca after she remarried. William observed that the provision in the agreement for hospitalization insurance for Rebecca terminated upon her remarriage. William testified that he paid Harrison's fee and understood that Harrison represented both Rebecca and him. He conceded that he and Rebecca negotiated most of the terms of the agreement without the assistance of the attorney but said he and Rebecca did not discuss the clause dealing with the obligation of his estate.

William acknowledged that he never had an appointment with Harrison prior to the execution of the agreement and received no counsel from him. William had a telephone conversation with Harrison in which the attorney said he was going to prepare the necessary papers. William read the agreement before signing it and questioned Harrison about paragraph (2). Although William knew that if Rebecca did not remarry it was his responsibility to provide for her and their daughter, he questioned the provision making payments a charge against his estate. He interpreted this provision to mean he would be "nothing more than an indentured servant" for the rest of his life.

William signed as "Seen" the interlocutory divorce decree of October 29, 1974. He employed an attorney to merge the interlocutory decree into a final decree of divorce in 1976.

Paragraph (1) of the agreement required William to pay to Rebecca $100 per month for the support of their infant daughter until she attained the age of 21, married, or became self-supporting. These payments were to be made from William's estate if he should die before they terminated. Under paragraph (7) William agreed to pay counsel fees not exceeding $500 and court costs incurred by Rebecca "in divorce proceedings to be filed."

In 1974, when the agreement was executed, William was 46, Rebecca was 41, and their daughter was 14. The evidence shows without contradiction that William was a banker and businessman. William did not testify to any business relationship with Harrison, but Harrison testified that he had known both Rebecca and William "socially" for many years. The only suggestion of an indirect business relationship is found in the testimony of a former secretary in Harrison's law office that William may have come into the office occasionally to present loan papers to another member of the law firm.

William's counsel in oral argument before us said that the only reason why an experienced businessman such as his client would make such an agreement binding him "beyond the grave" was because of Harrison's representation that it was "routine and would not affect him." Another more plausible explanation was offered by Rebecca. She testified that William was so much in love with another woman that he would have agreed to anything Rebecca wanted.

Harrison testified that Rebecca was his client, that he had no contact with William until the day the agreement was signed. He acknowledged that he was responsible for including the language of paragraph (2) and the similar provision in the interlocutory decree. He did not consider this a "routine" clause and did not think he had so described it to William. He did not think it was necessary to suggest that William employ his own attorney because William had been an "experienced businessman and banker in this city for many, many years." Harrison further testified that after the interlocutory decree was entered, William occasionally asked him when the divorce would become final but he declined to discuss it because Rebecca was his client and it was up to her to decide whether she would have Harrison merge the interlocutory

decree into a final divorce. Office records and the testimony of former secretaries in his law firm supported Harrison's testimony that only Rebecca was his client.

Rebecca testified that she employed Harrison to represent only her in the divorce proceedings. She said she and William worked out the details of the settlement agreement, that William was in full agreement with its terms, that she told William when the agreement was executed that she would receive support for the rest of her life, and that he expressed approval. Rebecca did not recall Harrison telling William that paragraph (2) was a routine clause. She said William wanted the divorce, agreed to pay for it, and did so. At that time, she was not working. According to Rebecca, although Harrison suggested that paragraph (2) be included in the agreement, she discussed the suggestion with William and received his approval before it was made a part of the written agreement.

From this evidence, the trial court found that while there was no actual fraud there was an "overtone of unintentional constructive fraud." We will assume that "overtone" means "implication" or "suggestion," as defined in Webster's Third New International Dictionary 1611 (1966). This is an insufficient finding upon which to base constructive fraud. We have recently restated the rule that constructive fraud must be established by clear, cogent, and convincing evidence. *Nuckols* v. *Nuckols*, 228 Va. 25, 37, 320 S.E.2d 734, 740 (1984). We have also approved the definition of constructive fraud found in Black's Law Dictionary 284 (5th ed. 1979) as "[b]reach of legal or equitable duty which, irrespective of moral guilt, is declared by law to be fraudulent because of its tendency to deceive others or violate confidence." *Id*. at 38, 320 S.E.2d at 741.

A finding of an implication or suggestion of constructive fraud is something less than a finding of constructive fraud. The trial court based its finding upon the "peculiar relationship" of Rebecca and William to Harrison. The only relationship which the evidence discloses is that Harrison knew both of them socially. Such a relationship, under the evidence in this case, is insufficient to justify a finding that Harrison's conduct had the appearance of impropriety. Harrison notified William by letter of his intention to present the interlocutory decree to the trial court for entry on a specified date. Harrison explained that he gave this notice as a courtesy to an unrepresented party in accordance with his usual

practice. Undoubtedly, it would have been more prudent for Harrison either to have notified William in writing at the outset that Harrison was representing only Rebecca and that William must employ his own attorney if he needed advice or to have included an explanatory statement of representation in the agreement. But William, though asserting that he believed Harrison was representing both Rebecca and himself, conceded that he received no counsel from Harrison.

The trial court made no finding of impropriety or unethical conduct on the part of Harrison. Findings of an appearance of impropriety and an overtone of constructive fraud, if we assume *arguendo* such findings were supported by the evidence, are insufficient to establish constructive fraud. Contrary to William's argument, the evidence does not show that Harrison attempted to represent both parties to the divorce. Rather, the evidence shows that William elected to represent himself.

The trial court also found that the agreement lacked mutuality. We assume that the court meant that there was no meeting of the minds as to paragraph (2) because that was the only part of the agreement held to be void and unenforceable. The evidence shows that Rebecca and William negotiated all other details of the agreement, and, indeed, Rebecca testified that William agreed to the provisions of paragraph (2) before Harrison prepared the agreement in final form.

Mutual assent by the parties to the terms of a contract is crucial to the contract's validity. *See Valjar, Inc.* v. *Maritime Terminals*, 220 Va. 1015, 1018, 265 S.E.2d 734, 737 (1980); *Chittum, Sheriff* v. *Potter*, 216 Va. 463, 467, 219 S.E.2d 859, 863 (1975); *McAfee* v. *Brewer*, 214 Va. 579, 581, 203 S.E.2d 129, 131 (1974). In evaluating a party's intent, however, we must examine his outward expression rather than his secret, unexpressed intention. *Lucy* v. *Zehmer*, 196 Va. 493, 502, 84 S.E.2d 516, 521 (1954).

> The mental assent of the parties is not requisite for the formation of a contract. If the words or other acts of one of the parties have but one reasonable meaning, his undisclosed intention is immaterial except when an unreasonable meaning which he attaches to his manifestations is known to the other party.

*Id.* at 503, 84 S.E.2d at 522 (citation omitted). A meeting of the minds requires a *manifestation* of mutual assent, and a party's mental reservation does not impair the contract he purports to enter. *See* Restatement (Second) of Contracts §§ 17-19, 17 comment c (1981).

■ William was aware of paragraph (2). According to his testimony, he questioned Harrison about it and was satisfied with the explanation that this was a provision commonly used to protect a wife in divorce proceedings. William concluded that the spousal support requirement would terminate upon Rebecca's remarriage. But he never disclosed this interpretation to Rebecca or Harrison. He executed the agreement, never indicating that he intended to be bound to pay spousal support only until Rebecca's death or remarriage. His undisclosed intention in light of his actions cannot defeat the terms of the bargain he voluntarily entered. Even if he were told that inclusion of the provision was routine, such a statement would not justify a conclusion directly contrary to the meaning of the plain language of the agreement and the interlocutory decree. The evidence shows that William read the agreement and that he was fully capable of understanding the language used. He was not a lawyer, but he was a banker and businessman with years of experience. There was nothing technical, obscure, or ambiguous in the wording of the agreement and the decree. William signed both. We hold that the evidence does not support the finding of the trial court that the agreement in part was void for lack of mutuality.

■ From a careful review of the evidence, we conclude that the findings of the commissioner in chancery were supported by the evidence, that the findings of fact and rulings of the trial court were not supported by the evidence, and that Rebecca is entitled to have William fulfill the obligations required of him. Accordingly, we will reverse the decree of the trial court and remand the case for the entry of a decree requiring specific performance by William of his contractual obligations to Rebecca and for such other relief as Rebecca may be entitled to receive.

*Reversed and remanded.*