# Charles Spence, et al.

## v.

# Hattie A. Griffin

Record No. 850825

September 23, 1988

Present: All the Justices

*Paul M. Penick* for appellants.
*Joseph A. Sanzone* for appellee.

POFF, J., delivered the opinion of the Court.

Grantees, seeking reformation of an easement reserved by a grantor in a deed of gift, appeal from a decree granting the prayer of the grantor's cross-bill for rescission on the ground of fraud.

The record shows that, in July 1983, appellants, Charles Spence, a self-educated, itinerant evangelist, and his wife, Laura, left their home in West Virginia. Travelling in two trailers loaded with a tent and other equipment used to conduct religious "revivals", they arrived in Buena Vista where they saw a vacant lot behind a "Soft Serve" restaurant. Mr. Spence approached Mrs. Hattie Griffin, the owner of the restaurant and the lot, and inquired whether he could rent the lot, erect his tent, and hold a revival. Mrs. Griffin replied that she would make no charge for the use of her lot "[i]f you're a preacher and are going to preach".

During the ensuing three weeks, the Spences conducted daily religious meetings in the tent erected on Mrs. Griffin's property. Although the Spences had parked their camper in Mrs. Griffin's yard and made connections with her water and electrical supplies, they accepted her invitation to sleep in her home. Mrs. Griffin gave Mr. Spence a key to her house and allowed him and his wife to eat without charge in her restaurant.

Earlier that year, Mrs. Griffin's estranged husband had threatened to kill her two children, born of a previous marriage, and to burn down her house if she did not consent to a divorce. Even though she had given her consent, her husband shot and killed her son in March 1983. Mrs. Griffin, who had undergone open-heart surgery several years before, was still under a doctor's care when the Spences arrived in July.

In search of spiritual comfort, Mrs. Griffin attended the revival meetings and, responding to Mr. Spence's public entreaties, had donated several hundred dollars to his ministry. At one of those meetings, Mr. Spence stood in front of his congregation and asked Mrs. Griffin if she would donate her lot for the building of a church. Mrs. Griffin agreed, but she later protested that "it didn't hit me right, because I didn't think that should be brought out before everybody in there".

Mrs. Griffin testified that one night after she returned from work at the restaurant, Mr. Spence "asked me three or four times to see the deed" by which she had acquired the lot. She brought him the deed, and after he had read it, she laid it on the "grand-

father clock in the living room." After the Spences had left on a trip to West Virginia, Mrs. Griffin "looked on top of the clock to get the deed to put it away" and discovered "[t]he deed was gone."

The Spences first took the deed to Wilson Miller, an attorney, and asked him to prepare a deed conveying the lot to them. Miller consulted Mrs. Griffin who told him that she was willing to donate the lot for the building of a church but if it ever ceased to be a church, the property was "[t]o come back to me." Meanwhile, she wanted to reserve the right for customers of her restaurant to park on the lot.

The Spences retrieved Mrs. Griffin's deed from Miller and employed another attorney, John Robert Lewis, Jr. Mrs. Griffin testified that Mr. Spence had told her that he had changed lawyers because Miller "couldn't do it quick enough for him."

When Lewis contacted Mrs. Griffin, she told him, "I give it for the church only, and, if it wasn't a church, it was to come back to me, that I did not give it to the Spences." She added, "I will have to have parking back there." Speaking of Mr. Spence's first visit to his office, Lewis testified, "Apparently, at that time, Mrs. Griffin was going to deed the property outright to Mr. Spence." After talking with Mrs. Griffin, however, Lewis learned that "if the land was no longer used for church purposes — that she would want the property reverted back to her."

Lewis drafted a "DEED OF GIFT" conveying the lot to Mr. and Mrs. Spence as tenants by the entirety. The stated consideration was "religious interest and Christian affection". The draft contained language reserving to Mrs. Griffin "a right of way across, over and through the said Lot . . . for the purpose of parking motor vehicles", but it did not include a reversionary clause.

Late in the afternoon on September 1, 1983, Mrs. Griffin was invited to leave her restaurant and meet Lewis and the Spences in the office of the clerk of the circuit court. She testified that Lewis "laid [the deed] down there. And he said, 'It's — it's drawn up like you had asked.' So I just went on and signed it to get back to my place of business, because we were busy up there when I left it." She acknowledged that she had not read the deed carefully but "just kind of sketched over it, and he said 'It's like you wanted it.' So that's the reason I signed it." She added, "I trusted him as an attorney, and I trusted Spence as a preacher."

The deed of gift was admitted to record at 4:55 p.m. Before she left the clerk's office, Mrs. Griffin approached Mrs. Spence and said, "I gave it for a church . . . [but] I've got nothing here to show or take anything off of my income." At the Spences' request, a typist prepared a receipt. In her own handwriting, Mrs. Spence inserted the words, "To build a Church", and the Spences signed the receipt and handed it to Mrs. Griffin. In reply to the question, "[A]t that time, what did you think the deed said?", Mrs. Griffin stated, "I thought it was for the church and that . . . my parking would be on the first part of the lot."

Lewis testified that Mrs. Spence had paid him $25 to draft the deed of gift and that Mr. Spence's "main concern was that the property would be deeded to him and his wife outright, that they would have the decision to make whether or not to sell the property." Lewis acknowledged that Mrs. Griffin had told him that she wanted the lot used to build a church, but he said "if I put in the language . . . that it was to be used for church purposes, then it would be, in fact, a reversionary situation . . . and Mr. Spence did not agree to that." Lewis said that, although he tried to explain the contents and effect of the deed to Mrs. Griffin before she signed it, "I think that she didn't understand exactly what was in the deed."

After the deed was admitted to record, the Spences obtained a permit to construct a building estimated to cost $40,000. The size of the building was to be 50 feet by 60 feet. The center was reserved for a sanctuary. "Wings" planned on both sides consisted of bedrooms, living rooms, kitchens, and bathrooms. The Spences later decided to include a basement for their son to use as a place to store and sell carpets and rugs to raise money for the church. As construction progressed, it became clear that the project could not be financed by current contributions from the congregation, and the Spences applied for a construction loan. The bank refused the application on the ground that the broad definition of the parking easement made the property unmarketable.

Mr. Spence reported this to Mrs. Griffin, showed her the deed of gift, and asked her "to take the easement off it and to get it fixed up right". Mrs. Griffin testified that she read the deed and, for the first time, learned that the lot had been conveyed to the Spences rather than to a church. She agreed to obtain a survey and modify the language defining the easement, but she insisted that, in order to "fix it up right", the deed of correction should

provide that "if there wasn't a church built back there, it would come back to me, not to him and her."

The parties were unable to agree, and construction of the building was discontinued in December 1983. At that time, $17,200 had been spent, $4,500 of which had been obtained by the Spences on a personal loan, and creditors were demanding payment of delinquent bills for building supplies. A real estate broker estimated the value of the unfinished building, absent mechanics' liens, at $20,000 and the value of the land, unencumbered by the parking easement, at $6,500.

The Spences filed a bill in chancery praying that the parking easement "be removed due to mistake and fraud". They alleged that the provision "amounts to a taking of the real estate on the part of Defendant and unjust enrichment to the Defendant" and that "the Defendant fraudulently induced Plaintiffs to construct a valuable building on the real estate knowing that the conveyance as made would prevent them from selling, mortgaging or using the real estate in any manner."

The evidence shows, as the commissioner found, that "Mr. Spence made it clear to all within his hearing that he was independent of any church affiliation, that he was the 'church' and would run it as he pleased." Mr. Spence insisted that title be transferred to him and his wife because, he said, "I wouldn't want to be bound down to tie up thousands of dollars and no way to get it out." "If we'd outgrow the building," he continued, "or if we just . . . found a better place . . . we could sell this and move down there."

Mr. Spence testified that he had served as pastor of a church in Ohio and currently was pastor of a church in Charmco, West Virginia. The title to both churches had been conveyed to the Spences as individuals. Mr. Spence explained, "I donate the church . . . to the congregation to worship in."

The Charmco church contained six apartments. The Spences collected the rent from the tenants and reported it on their individual income tax returns. Concerning real estate taxes, Mr. Spence said that "I could put it in the church name, if I wanted to, and exempt it. But . . . I prefer to pay the tax on it, and that's the way I do it."

The rental income and all contributions collected at religious services conducted by the Spences were deposited in three checking accounts. All were opened in names of churches, but each was

subject to withdrawal only on the Spences' personal signatures. The Spences pay the Charmco mortgage and the "ministry expenses" they incur out of these funds, and when the balance in the accounts permit, they pay themselves a salary. According to Mr. Spence, "We take what we get out of the church . . . and that is our personal money. I can do anything I wanted to do with it." During the first week of the 1983 revival, the Spences used funds from these accounts to make the down payment on a 1983 Cadillac automobile titled in their names.

Mrs. Griffin had answered and denied the substantial allegations of the Spences' bill of complaint and had filed a cross-bill alleging fraud and undue influence and demanding rescission of the deed of gift. Although the commissioner found that the evidence was insufficient to prove fraud on the part of either party, he concluded that "Mr. and Mrs. Spence have obligated themselves as 'trustees' for the construction of a church" and that they should be "put to an election" either to "re-establish their congregation and solicit pledges (not collect money) for the purpose of determining whether or not there is sufficient interest in the community to continue the building project" or to submit to rescission of the deed of gift and restoration of title to Mrs. Griffin. In event of rescission, he added, "the Spences would be required to pay off any indebtedness which may constitute a lien . . . [but] permitted to salvage whatever is possible out of the improvements already on the property".

Disagreeing with the commissioner, the chancellor ruled that "the evidence as a whole makes out a clear and convincing case of actual fraud" on the part of the Spences. Based upon that ruling, the chancellor entered a final decree denying the Spences' prayer for reformation of the parking easement and directing instead that "the deed . . . be rescinded forthwith"; that a special commissioner "reconvey the land in dispute to Hattie A. Griffin"; that the Spences "liquidate any indebtedness which may constitute a lien on [her] interest" and that the Spences "be permitted to salvage the improvements made by them".

On appeal, the Spences urge us to uphold the commissioner's finding that the evidence was insufficient to satisfy the legal definition of fraud and to reject the chancellor's ruling to the contrary. We consistently have held that, when the commissioner and the chancellor disagree, "[w]e must . . . review the evidence to ascertain whether, *under a correct application of the law*, the

evidence supports the *findings* of the commissioner or the *conclusions* of the trial court." *Wiltshire v. Pollard,* 220 Va. 678, 680, 261 S.E.2d 542, 543 (1980) (emphasis added) (citations omitted); *see, e.g., Sprott* v. *Sprott,* 233 Va. 238, 240, 355 S.E.2d 881, 882 (1987); *Wells* v. *Weston,* 229 Va. 72, 75, 326 S.E.2d 672, 674 (1985); *Hill* v. *Hill,* 227 Va. 569, 577, 318 S.E.2d 292, 296-97 (1984).

We think the commissioner's finding was not based upon correct principles of the law of fraud and deceit.

The elements of actual fraud are: (1) a false representation, (2) of a material fact,[*] (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled. The burden is upon the party charging fraud to prove it by clear and convincing evidence.

*Winn* v. *Aleda Const. Co.,* 227 Va. 304, 308, 315 S.E.2d 193, 195 (1984) (citations omitted).

In support of the commissioner's finding, the Spences argue that the evidence fails to prove that they made any false representation that induced Mrs. Griffin to execute the deed of gift. They seem to assume that the only type of misrepresentation contemplated by the definition of actual fraud is an intentional, express verbalization of a falsehood. Concerning an allegation of actual fraud, we have said that "[c]oncealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud." *Allen Realty Corp.* v. *Holbert,* 227 Va. 441, 450, 318 S.E.2d 592, 597 (1984) (citation omitted).

For purposes of an action for fraud, concealment, whether accomplished by word or conduct, may be the equivalent of a false representation, because concealment always involves deliberate nondisclosure designed to prevent another from learning the truth. A contracting party's willful nondisclosure of a material fact that he knows is unknown to the other party may evince an intent to practice actual fraud. *See Bossuyt* v. *Osage Farmers Nat. Bank,*

---

* In fraud cases, "a fact is material when it influences a person to enter into a contract, when it deceives him and induces him to act, or when without it the transaction would not have occurred." *Packard Norfolk* v. *Miller,* 198 Va. 557, 563, 95 S.E.2d 207, 211-12 (1956) (citations omitted).

360 N.W.2d 769, 774 (Iowa 1985); *Allstate Redevelopment* v. *Summit Assoc.*, 206 N.J. Super. 318, 326, 502 A.2d 1137, 1141 (1985); *Mitchell* v. *Straith*, 40 Wash. App. 405, 410-11, 698 P.2d 609, 612 (1985); Restatement (Second) of Contracts, § 161 (1982).

■ Applying that principle and the standard of proof required to establish fraud to the facts in this case, we find that Mrs. Griffin always intended her gift to be conditioned upon the construction and continued use of a church for religious purposes; that, in event of breach of that condition, she intended title to the lot to revert to her name; that the basic assumption inducing her to execute the deed was that the instrument she signed imposed that condition and contained a reversionary clause; that her mistaken belief that the deed contained those provisions was induced by the assurances given her at the time by the Spences' own agent; and that the Spences were aware that Mrs. Griffin was acting on that mistake.

■ "We have long adhered to the rule that 'a principal is bound by representations of his agent, made either in the scope of his employment or in furtherance of the object for which he is employed.' " *Nationwide Ins. Co.* v. *Patterson*, 229 Va. 627, 632, 331 S.E.2d 490, 493 (1985) (quoting *Cerriglio* v. *Pettit*, 113 Va. 533, 542, 75 S.E. 303, 307 (1912)). At the time the deed of gift was executed, the clerk's office was about to close for the day; Mrs. Griffin was anxious to return to her place of business; she trusted Mr. Spence "as a preacher" and Mr. Lewis "as an attorney"; and she was assured that the deed was "like [she] wanted it." Under these circumstances, Mrs. Griffin did not read the deed of gift thoroughly and, as a general rule, a grantor's failure to read the deed does not relieve him of its obligations. The rule does not apply, however, where, as here, "the grantee . . . induced the grantor not to read it." *Carter* v. *Carter*, 223 Va. 505, 509, 291 S.E.2d 218, 221 (1982) (citations omitted).

■ We are of opinion that good faith dealing required the Spences to correct Mrs. Griffin's mistake by disclosing the true contents and effect of the deed before she signed it and that their nondisclosure was the equivalent of a fraudulent assertion of a material fact, knowingly made with intent to mislead. Accordingly, we will uphold the chancellor's decision that execution of the deed of gift was induced by actual fraud.

Ordinarily, "where the transaction is avoided because of actual fraud, the grantee is not entitled . . . to compensation for improvements he has made." *Payne* v. *Simmons*, 232 Va. 379, 385, 350 S.E.2d 637, 641 (1986) (citations omitted). Because Mrs. Griffin agreed otherwise in her exceptions to the commissioner's report, we will affirm the final decree in all its parts.

*Affirmed.*