### Richmond

ERNEST B. NUCKOLS, JR., ET AL.

V.

ELEANOR S. NUCKOLS, ETC.

Record No. 820968.

September 7, 1984.

Present: All the Justices.

James H. Walsh (*Robert E. Draim; McGuire, Woods & Battle*, on briefs), for appellants.

*E. Preston Lancaster, Jr.* (*Watkins M. Abbitt*, on brief), for appellee.

CARRICO, C.J., delivered the opinion of the Court.

On March 13, 1979, Eleanor S. Nuckols, an eighty-four-year-old widow, executed two deeds of conveyance. The first conveyed to Ernest B. Nuckols, Jr., and Hilda Nuckols, the grantor's son and daughter-in-law, jointly, "an estate for their lifetimes" in approximately two acres of land in Cumberland County, including a dwelling. The other conveyed to Ernest Nuckols alone in fee simple an adjoining eighteen-acre tract improved with growing Christmas trees.

On August 27, 1980, J. Taylor Williams, Eleanor Nuckols' son-in-law, filed in her name and in his capacity as her attorney-in-fact a bill of complaint against Ernest B. Nuckols, Jr., and Hilda

Nuckols (hereinafter, the defendants). The bill of complaint, as supplemented by a bill of particulars, sought the rescission of the two March 13, 1979 deeds on the grounds of inadequate consideration, undue influence, and constructive fraud. During the course of the proceeding, Terry L. Van Horn was appointed Eleanor Nuckols' guardian, and the cause continued thereafter under the style, "Eleanor S. Nuckols, a person under a disability, by Terry L. Van Horn, her guardian and next friend, and Terry L. Van Horn, guardian" (hereinafter, the plaintiffs).

The chancellor heard the matter ore tenus, and, on March 5, 1982, entered a final decree declaring both deeds "null and void and of no effect." In a written opinion filed March 24, 1982, the chancellor stated that the deeds were set aside because of lack of consideration, undue influence, and both actual and constructive fraud.

The record shows that the property in dispute, comprising the Nuckols' homeplace, is located in the village of Cumberland and consists of a dwelling and approximately twenty acres of land. Eleanor Nuckols and her husband, a physician, acquired the property and moved there sometime prior to 1920. Doctor Nuckols conducted his medical practice from an office in the dwelling.

In addition to their son, Ernest, Jr., Dr. and Mrs. Nuckols had a daughter, Kathleen. Both children were raised in Cumberland, and both went away to college. Afterward, Ernest, Jr., entered the United States Air Force and rose to the rank of colonel; Kathleen married J. Taylor Williams, who became an attorney-at-law. Kathleen and Taylor Williams moved to Cumberland in 1954. They built a house across the road from her parents' home, and he went into the practice of law in Cumberland.

Doctor Nuckols died in 1956 and by will left the property in question to his wife. For a number of years after his death, she lived alone in the homeplace, except for servants and boarders. In the early 1960's, when her son's retirement from the Air Force appeared imminent, Eleanor Nuckols asked him several times "to come back and live with her." According to his testimony, she promised that "the home place would be [his] when she was gone . . . if [he] came back to her."

Colonel Nuckols retired from the Air Force in 1964. He and his wife and their sons moved into the homeplace with Eleanor Nuckols, who occupied an apartment converted from the space Dr. Nuckols had used for his medical office. Colonel Nuckols testified

that his mother became "a full member of [his] family," eating "the majority of her meals" with him and spending most of her time in his "area of the house."

Colonel Nuckols testified further that, upon his return to Cumberland, he found the homeplace in "pretty bad shape," necessitating extensive interior and exterior repairs, which he made at his own expense. With his mother's consent, he planted approximately 60,000 Christmas trees on the eighteen-acre portion of the property to the rear of the dwelling. In his testimony, he stated that his mother wanted him to have the Christmas-tree property and had told him several times to "go ahead and get the deed for it," but he "never got around to it."

In October, 1964, after Col. Nuckols had agreed to return to Cumberland, Eleanor Nuckols made a will. She devised the homeplace to her son for life, with remainder to his children, provided he pay his sister the sum of $14,250. In October, 1974, Eleanor Nuckols executed a codicil to the 1964 will which revoked the foregoing provisions and directed that the homeplace be appraised, that the value of the Christmas trees planted by Col. Nuckols and of any other improvements made by him be deducted from the appraisal, and that one-half the adjusted value be paid to Kathleen Williams. The codicil then provided that, upon such payment, Col. Nuckols was devised the homeplace for life with remainder to his children.

Eleanor executed another will in June, 1976. This time, she devised the homeplace to Col. Nuckols for life with remainder to his children, provided that he pay Kathleen Williams a sum equal to one-half the value of the property, less an advancement of $16,500 made to Kathleen and plus $1,000 for each year Col. Nuckols occupied the property since 1965. The will provided also that improvements made by Col. Nuckols, including the Christmas trees he had planted, should not be considered in determining value.

At some later time, portions of the 1976 will were stricken, and Eleanor Nuckols initialed the changes. As a result, the will purported to devise the homeplace to Col. Nuckols in fee simple on the condition that he pay his sister one-half the adjusted value of the property. Taylor Williams testified the changes were made at Col. Nuckols' request, but the colonel denied he wanted the will "changed . . . that way."

In February, 1978, Eleanor Nuckols suffered a broken hip. Following her discharge from a Richmond hospital, she spent several

weeks recuperating in the home of her daughter and son-in-law, Kathleen and Taylor Williams.

According to Taylor Williams' testimony, he had "more or less" handled Eleanor Nuckols' business affairs since her husband's death. During her stay in his home in 1978, he noticed "she was getting very confused" when she attempted to pay her bills; as a result, he secured from her a general power of attorney authorizing him to assume the management of her affairs.

Eleanor Nuckols enjoyed a close relationship with Col. Nuckols and his wife on the one hand and Kathleen Williams and her husband on the other. The relationship between the two couples, however, was less than close; indeed, they had "broken off" communications some ten years prior to the hearing of the case in the trial court.

An event in January, 1979, further deteriorated the relationship between the two couples and even caused a rift between Eleanor Nuckols and the Williamses. In that month, Taylor Williams heard a report that Col. Nuckols and his family "were thinking about leaving" the area. Williams then placed an advertisement in the *Farmville Herald* listing his telephone number and offering the Nuckols' homeplace "RENT FREE . . . for a family willing to care for semi-invalid lady." He placed the ad, Williams testified, because he wanted "to see if [he] could find someone to move in and look after" Eleanor Nuckols "in the event that [Col. Nuckols] did leave."

The members of the Nuckols' household learned of the ad when a couple knocked on their door and inquired whether "this [is] the house that's rent free for someone to stay with . . . an elderly lady." According to Col. Nuckols' testimony, Eleanor Nuckols was "very upset" when she learned about the ad, and there was "quite a scene" when she confronted Taylor Williams and heard his version of "what was going on."

Eleanor Nuckols discussed the matter with her son, and she told him: "Do something to get this thing straightened out so you can stay here." He contacted Robert Woodson, a Cumberland attorney, but Woodson said "he'd rather not get involved" and recommended William A. Talley, a Palmyra attorney.

Colonel and Mrs. Nuckols conferred with Talley in his office on February 6, 1979. Testifying below, Talley said that he was asked to prepare one deed granting a fee simple interest in the eighteen-

acre tract "where Christmas trees were growing" and another granting a life estate in the two-acre parcel "where the house is."

Talley prepared the deeds and mailed copies to Col. Nuckols. The colonel went over the deeds with his mother and also took them to her brother, Charles Sanderson, upon whom she often relied for advice. According to Col. Nuckols' testimony, neither his mother nor his uncle had any question about the deeds. Sanderson testified, however, that, while he understood the deed conveying "the land the Christmas trees were planted on," he did not understand the one which conveyed the joint life estate.

On March 13, 1979, Col. Nuckols drove his wife, his mother, and Charles Sanderson to Talley's office in Palmyra. Anticipating "that [the transaction] could be a problem in the future," Talley recorded the conversation on tape. He read the deeds to Eleanor Nuckols and undertook to explain their import. She then signed and acknowledged each instrument.

When asked at trial whether Eleanor Nuckols understood the instruments, Talley replied, "I hope so; I thought she did." Talley stated he did not tell Eleanor Nuckols that, by granting her son and daughter-in-law a life estate in the two-acre tract containing the Nuckols' home, she "could [be] put . . . out anytime during their life-time." Talley said he did tell Eleanor Nuckols, "[y]ou'd be there and they'd be there," and he declined at trial to answer "yes or no" to the question whether this statement would lead her "to believe that she'd be there and they'd be there and nobody could put her out."

Taylor Williams learned of the deeds sometime later when he talked with Robert Woodson, who told him "to check the clerk's office." After Williams discovered the deeds, this litigation was initiated.

On appeal, the defendants (Col. and Mrs. Nuckols) contend that because fraud and undue influence were the grounds alleged for rescinding the deeds, the burden was upon the plaintiffs to prove the allegations.[1] Yet, the defendants complain, the chancellor held that the execution of the deeds was presumptively fraudu-

---

[1] As noted previously, the chancellor set aside the deeds in question on the grounds of lack of consideration, undue influence, and both actual and constructive fraud. In their bill of particulars, however, the plaintiffs stated they were relying upon inadequate consideration, constructive fraud, and undue influence, and they admit in their brief that the bill of particulars "bound [them] to limit [their] case" to the grounds set forth in the bill of particulars. Actual fraud was not one of the grounds listed therein. Hence, we will not

lent or the result of undue influence and, hence, that the burden was upon the defendants to prove that the transaction was free of fraud or undue influence. In so holding, the defendants maintain, the chancellor improperly shifted the burden of proof "and committed clear error."

The plaintiffs do not agree that the chancellor shifted the burden of proof to the defendants. In three places in their brief, the plaintiffs characterize the requirement imposed upon the defendants as the burden of going forward with the evidence.

We disagree with the plaintiffs on their analysis of the chancellor's holding. In unmistakable terms, the chancellor stated in his written opinion that, although a party alleging fraud and undue influence ordinarily has the burden of proving the allegations, a different rule prevails where a confidential or fiduciary relationship exists. In this latter situation, the chancellor wrote, dealings between the parties are closely scrutinized, and transactions which are beneficial to a dominant party, "such as an agent," and detrimental to the other are presumed to be fraudulent or the result of undue influence. In an action to set aside a transaction involving a deed, the chancellor continued, the burden is upon the defendant "to show by clear and satisfactory evidence that there was no undue influence or undue advantage because of the relationship and that the grantor was fully informed and understood the nature and effect of the transaction."

The chancellor held that the relationship necessary to the creation of the presumption existed in the present case and that the burden was upon the defendants to prove the absence of fraud and undue influence. The chancellor based his finding that a confidential or fiduciary relationship existed on the proposition that Col. Nuckols was the agent for his mother for the purpose of making arrangements "to enable him and his family to remain in the home with [the mother]." The chancellor then ruled Col. Nuckols had breached his fiduciary duty by exceeding his limited powers and by failing to see that Eleanor Nuckols was fully informed of, and clearly understood, the effect of what she was doing in signing the deeds. Finally, finding that the defendants had failed to carry their burden of proof, the chancellor declared the deeds invalid.

further consider actual fraud. The subject of inadequate consideration will be mentioned *infra.*

In support of the chancellor's ruling on burden of proof, the plaintiffs cite *Fishburne and Wife* v. *Ferguson's Heirs*, 84 Va. 87, 4 S.E. 575 (1887), and the plaintiffs say that they "based [their] case" on the decision. There, the deed in question conveyed to friends of the grantor property worth $6,000 in return for the grantees' promise to care for the grantor, who was " 'fatally diseased' " and "physically a wreck," *id.* at 103, 4 S.E. at 578, as well as " 'unquestionably insane,' " *id.* at 109, 4 S.E. at 580. The jury, on an issue out of chancery, found the grantor incapable of understanding the deed's purpose and object, and the trial court cancelled the deed on that ground.

In the course of its opinion, this Court stated it was the rule that "where one person stands in a relation of special confidence towards another, so as to acquire an habitual influence over him, he cannot accept from such person a personal benefit without exposing himself to the risk, in a degree proportioned to the nature of their connection, of having it set aside as unduly obtained." *Id.* at 112-13, 4 S.E. at 582. And this Court said that the grantees in the case assumed toward the grantor "the most intimate and confidential relations . . . in which . . . they . . . gained his confidence, and acquired influence over him." *Id.* at 112, 4 S.E. at 582.

The Court also said that there was an inference or presumption applicable to the case, *id.* at 110-11, 4 S.E. at 581-82, and, consequently, the burden of proof was shifted to the grantees to show that the grantor had sufficient intelligence to understand the deed and that he acted freely, *id.* at 114, 4 S.E. at 583. It is clear from the opinion, however, that the inference or presumption and the shifting of the burden of proof resulted as much from the circumstances involving the mental and physical condition of the grantor as from the relationship of the parties; those circumstances, the Court stated, gave "rise to the strongest presumption against the validity of the deed," *id.* at 109, 4 S.E. at 580, and prompted the Court to adopt the rule that where "great weakness of mind concurs with gross inadequacy of consideration, or circumstances of suspicion, the transaction will be presumed to have been brought about by undue influence, and will be set aside," *id.* at 111, 4 S.E. at 582.

Before this presumption is available to a plaintiff, however, he or she must show that the grantor suffers "great weakness of mind" and that such weakness concurs with gross inadequacy of consideration or circumstances of suspicion. Here, the plaintiffs

did not satisfy the first requirement of this rule, *viz.*, the "great weakness of mind" of the grantor; indeed, in their bill of particulars, the plaintiffs conceded that mental incompetence was not "an issue per se in this case since Plaintiffs have no evidence that Eleanor S. Nuckols was incompetent to any degree of medical certainty at the time of executing the deeds."[2] Hence, the *Fishburne* case is inapposite.

In further support of the chancellor's ruling on burden of proof, the plaintiffs cite: *Statham & als.* v. *Ferguson's adm'r & als.*, 66 Va. (25 Gratt.) 28 (1874); *Nicholson* v. *Shockey*, 192 Va. 270, 64 S.E.2d 813 (1951); *Jackson* v. *Seymour*, 193 Va. 735, 71 S.E.2d 181 (1952); *Creasy* v. *Henderson*, 210 Va. 744, 173 S.E.2d 823 (1970); and *Devlin* v. *Devlin*, 89 S.C. 268, 71 S.E. 966 (1911). In *Statham*, however, the relationship involved a widow-legatee and her stepsons-in-law who were administrators of her husband's estate; in *Nicholson*, a mother and a son who was her attorney, agent, and confidential adviser; in *Jackson*, a sister and a brother on whom she relied for advice and judgment in her business affairs; in *Creasy*, a woman and a sister who was her attorney-in-fact under a general power of attorney; and, in *Devlin*, a sister and a brother to whom she entrusted her business affairs and who acted as her general adviser and often as her agent. In other words, in each of the above cases, there was something more than familial connection, something of a concrete business nature involving a certain degree of trust, upon which the finding of confidential or fiduciary relationship was based.

Here, in an obvious effort to bring their case within the rationale of the above decisions, the plaintiffs say that "[t]he association of Col. Nuckols and his wife to Eleanor Nuckols, taken from their own testimony,[3] shows that they assisted in managing her af-

---

[2] The plaintiffs stated further in their bill of particulars that they reserved "the right to introduce testimony to the effect that Eleanor S. Nuckols was an individual of advanced age, subject to being influenced, and being more lucid on one day as opposed to another." The plaintiffs did prove, of course, that Eleanor Nuckols was of "advanced age," but this is insufficient, standing alone, to show "great weakness of mind." *Howard* v. *Howard*, 112 Va. 566, 572, 72 S.E. 133, 135 (1911). The plaintiffs also produced some medical testimony, but they do not even suggest that it was sufficient to show "great weakness of mind" on the part of Eleanor Nuckols.

[3] The reference to "their own testimony" can apply only to the testimony of Col. Nuckols and his wife. Eleanor Nuckols did not testify; in his written opinion, the chancellor stated that Eleanor Nuckols was "unable to testify concerning the transactions at issue in this case."

fairs." The plaintiffs say further that "[t]his can only be gathered by a complete reading of their testimony."

We have read every word of the testimony of Col. and Mrs. Nuckols and find only one passage which even remotely tends to support the notion that either of them managed Eleanor Nuckols' affairs. That passage is found in a rambling answer Col. Nuckols gave to a question concerning Eleanor Nuckols' execution of wills other than the 1964 document. After responding that he "started seeing drafts of wills in [his] mother's desk," Col. Nuckols stated: "Contrary to what [Taylor] Williams said, I did help Mother with some of her finances at times when she'd ask me . . . ." This vague and indefinite statement is too slender a reed upon which to base a finding of a confidential or fiduciary relationship between Eleanor Nuckols and her son.

The plaintiffs also endorse the chancellor's ruling that a confidential or fiduciary relationship resulted from Col. Nuckols' purported role as the agent of his mother for the purpose of making arrangements to "enable him and his family to remain in the home with [the mother]." The plaintiffs endorse the ruling, however, with an obvious lack of enthusiasm. In total, they say: "By undertaking to act in furtherance of his mother's instructions [Col. Nuckols] automatically became her agent and owed a duty to her not to exceed those instructions. Informal agencies of this type have been exemplified in *Devlin* v. *Devlin* and *Nicholson* v. *Shockey* . . . ."

In each of those cases, however, the agency relationship had been established through an extended course of dealing prior to the disputed transaction to which the principal and agent were parties. Here, the disputed transaction itself, and in particular Eleanor Nuckols' statement to her son to "[d]o something to get this thing straightened out," is the only basis cited by the chancellor for his finding that an agency relationship existed.

Agency has been defined as the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the agreement by the other so to act . . . . The law indulges no presumption that an agency exists. On the contrary one is legally presumed to be acting for himself and not as the agent of another.

*Raney* v. *Barnes Lumber Corp.*, 195 Va. 956, 966, 81 S.E.2d 578, 584 (1954).

Eleanor Nuckols' statement to her son to "[d]o something to get this thing straightened out" was not a manifestation of her consent for him to act on her behalf but merely a reaffirmation of his right to continue living on the property. He did not agree to act, and was not acting, on her behalf, but on his own account, in devising the particular method of formalizing that right. Hence, the agency theory provides no basis for the chancellor's finding that a confidential or fiduciary relationship existed between Eleanor Nuckols and her son.

■ This leaves the plaintiffs with only the parent-child connection to support such a finding. The plaintiffs quote 37 Am. Jur. 2d *Fraud and Deceit* § 16 (1968) for the proposition that "[t]he cases of *parent and child*, guardian and ward, trustee and cestui que trust, principal and agent, and attorney and client are familiar instances in which the principal of fiduciary relationship applies . . . . (emphasis added.) One may also find language in some of our cases to the same effect. *E.g.*, *Fishburne*, 84 Va. at 113, 4 S.E. at 582.

But we do not believe this Court has ever held that such a connection, standing alone, is sufficient to create a confidential or fiduciary relationship. Indeed, we have held expressly to the contrary. In *Orr* v. *Pennington*, 93 Va. 268, 273, 24 S.E. 928, 929 (1896), involving a conveyance from father to son, we said that "[c]ases of this kind plainly turn upon the exercise of actual undue influence of the child over the parent, and not upon any presumption of invalidity." This Court affirmed the trial court's dismissal of a bill of complaint seeking to set the conveyance aside.

More recently, in *Carter* v. *Carter*, 223 Va. 505, 509, 291 S.E.2d 218, 221 (1982), we dealt with a boundary agreement between a mother and son who, until less than a month before the agreement was signed, had served as his mother's committee. In a suit by the mother to set the agreement aside, she relied upon the relationship of the parties to sustain her allegations of fraud. We affirmed the trial court's refusal to set aside the agreement. We reasoned that "adults deal with each other as adults" and that "[d]ifferences in age and close relationship of blood do not destroy this rationale, especially when one party charges another with fraud." We stated that "[m]erely showing that a mother-son relationship exists will not support a charge of either actual or con-

structive fraud." And we said that "[w]hen a plaintiff alleges fraud or coercion, he has the burden of proving it by clear, cogent and convincing evidence."

We hold, therefore, that the chancellor erred in finding the existence of a confidential or fiduciary relationship between Eleanor Nuckols and her son, in ruling the deeds in question presumptively fraudulent or the results of undue influence, and in imposing upon the defendants the burden of proving that the execution of the deeds was free of fraud or undue influence; the chancellor should have required the plaintiffs to prove their case by clear, cogent, and convincing evidence. We find that these errors were prejudicial and require reversal.

The question remains whether we should enter final judgment here or remand the case for a new trial. We believe that a remand for a new trial, with the burden of proof allocated to the plaintiffs, is in order. The evidence in this case is voluminous, and it abounds with conflicts on material points. Resolution of those conflicts necessarily depends upon a determination of the credibility of witnesses, a function peculiarly within the province of the trier-of-fact. And, how the conflicts are resolved will determine whether there is clear, cogent, and convincing evidence of fraud or undue influence.

The defendants argue, however, that they are at least entitled to final judgment sustaining the validity of the deed to the Christmas-tree property. Eleanor Nuckols executed that deed, the defendants say, on the advice of her brother, Charles Sanderson, and not as a result of any unlawful conduct on the part of Col. Nuckols.

We think that the inquiry at the new trial should encompass both deeds. A crucial issue in the fraud aspect of the trial leading to this appeal was whether Eleanor Nuckols was correctly informed of, and fully understood, the nature and effect of the deed conveying a life estate in the two acres on which the Nuckols home is located. If it is determined on retrial she was misinformed and did not understand that deed, then it would be for the trier-of-fact to determine whether she would have executed either deed had she known the true situation.

The new trial will be limited to the issues of constructive fraud and undue influence. As indicated previously, the plaintiffs abandoned any claim of actual fraud, and they conceded that mental incompetence was not an issue in the case. Moreover, the plain-

tiffs' allegation concerning lack of consideration does not raise a separate issue but is subsumed in the questions concerning constructive fraud and undue influence; in a suit between the parties to a deed, inadequacy of consideration alone is not a ground for invalidating the conveyance, *see* 2 *Minor on Real Property* § 1082 (F. Ribble 2d ed. 1928), and evidence of inadequate consideration is relevant only to the issue of fraud, *Moore* v. *Gregory*, 146 Va. 504, 528, 131 S.E. 692, 699 (1925), or undue influence, which is itself "a species of fraud." *Price's Executor* v. *Barham*, 147 Va. 478, 482, 137 S.E. 511, 512 (1927).

Upon retrial, then, the burden will be upon the plaintiffs to establish the elements of constructive fraud or undue influence by clear, cogent, and convincing evidence. Constructive fraud consists of the "[b]reach of legal or equitable duty which, irrespective of moral guilt, is declared by law to be fraudulent because of its tendency to deceive others or violate confidence." *Black's Law Dictionary* 284 (5th ed. 1979). *See also Moore* v. *Gregory*, 146 Va. at 523, 131 S.E. at 697. Undue influence occurs when " 'manifest irresistible coercion . . . controls and directs the . . . actions' " of a person executing a deed or will and deprives him " 'of his volition to dispose of his property as he wished.' " *Gill* v. *Gill*, 219 Va. 1101, 1106, 254 S.E.2d 122, 124 (1979) (quoting *Wilroy* v. *Halbleib*, 214 Va. 442, 446, 201 S.E.2d 598, 601 (1974)). *See also Price's Executor* v. *Barham*, 147 Va. at 482-83, 137 S.E. at 512.

For the reasons assigned, the decree appealed from will be reversed, and the cause will be remanded for a new trial consistent with the views expressed in this opinion.

*Reversed and remanded.*