## CIRCUIT COURT OF FAIRFAX COUNTY

Ruth M. Anderson

v.

Cheryl Alston

December 8, 1994

Case No. (Law) 128330

BY JUDGE ARTHUR B. VIEREGG, JR.

On December 3, 1993, plaintiff Ruth M. Anderson initiated this breach of fiduciary duty suit against the defendant, her daughter, Cheryl Alston. This case was tried before this Court in a two-day *ore tenus* hearing on September 13 and 14, 1994. After the presentation of evidence and after final argument, this Court took the case under advisement. I am now prepared to furnish counsel and the parties my decision.

### I. *Anderson's Motion for Judgment*

On December 1, 1993, Anderson initiated this law action by filing her motion for judgment seeking damages for Alston's alleged breach of fiduciary duties arising out of Alston's agreement to assist Anderson with her financial affairs following the death of Anderson's husband. In her motion for judgment, Anderson alleged that Alston breached those fiduciary duties by inducing Anderson to enter into a series of transactions involving gifts and loans to Alston and certain companies that Alston had formed ("Questioned Transactions").

## II. *Facts*

The evidence established the following facts related to Anderson's action.

### A. *Background*

Anderson and her deceased husband, Frank Anderson, enjoyed a long marriage. Three children were born of their union: Karen Anderson Fisk, who at all times relevant to this case resided in Kansas; and twins, Charles Anderson and Alston, both of whom at all times relevant to this case resided in Northern Virginia. During their marriage, the Andersons assembled a substantial estate. With the assistance of investment advisors, Frank Anderson had made all of the decisions related to the management of the couple's assets. Frank Anderson died in 1985.

In the aftermath of Frank Anderson's death, Alston (who had recently returned to the Northern Virginia area) devoted substantial efforts to care for her mother. These efforts, especially those following an April meeting discussed *infra*, included assistance in setting up files relating to Anderson's financial matters; converting joint accounts owned by Anderson and her late husband to Anderson's name; collecting insurance proceeds; transmitting death certificates to interested parties (presumably vendors and potential creditors); and counseling her mother in one or more meetings with Roberta Zermuda (phonetic), a former Kidder Peabody account officer who had furnished investment advice to Frank Anderson before his death.

In the course of performing those services for her mother, Alston determined that there was a need in Northern Virginia to provide financial services to senior citizens like Anderson. With the support of her mother, she organized Alston & Associates, a sole proprietorship, to furnish the following services to senior citizens: budgeting, paying bills, settling disputes with creditors or others, providing income tax filing information short of tax advice, medical claims filing, Medicare claims filing, and similar services. In 1987, Alston incorporated Financial Resources & Education for Elder Society, Inc. ("FREES"), as a company to furnish such services to senior citizens, and Alston College Consulting Services, Inc. ("Alston, Inc."), as a company to furnish such services to college students and other non-senior citizens. Neither corporation, however, provided investment advice or investment management services to its clients.

In April, 1986, Anderson's eldest daughter, Fisk, traveled to Virginia in order to address concerns related to her mother's estate. A family meeting

was held, attended by Fisk, Alston, and Anderson ("April Meeting"). Varying accounts were received with respect to what occurred at that meeting. The Court finds that at the April meeting Alston, on account of her proximity to Anderson and on account of Alston's business experience, agreed to counsel and assist Anderson with regard to certain financial matters. However, contrary to the allegation of Fisk and Anderson that Alston agreed to direct Anderson's investments, the Court further finds that Alston's services were limited to the type furnished by her companies, FREES and Alston, Inc., and that they did not include the management and direction of Anderson's investments. This conclusion is borne out by the fact that no credible evidence was received that, between the April Meeting and May, 1993, Alston exercised Anderson's power of attorney to implement investment decisions for Anderson.

After the April Meeting, Alston and Anderson maintained a close mother-daughter relationship. At times, Anderson lived in Alston's home. Anderson became interested and active in Alston's efforts to furnish services to senior citizens. Indeed, Anderson was proud of the fact that her experience had provided the inspiration for her daughter's business; Anderson served on the board of directors of FREES; Anderson performed office work for FREES; and Anderson made sizeable donations to her daughter's companies. As Anderson herself testified, she and Alston enjoyed an excellent relationship from 1987 to 1992.

In the meantime, Alston attempted to assist her mother as she had agreed at the April Meeting. Toward that end, Alston counseled her mother to consult a Northern Virginia elder law attorney, Jean Galloway. Anderson did so, and as a result revised her will, created a living will, and delivered to Alston durable and medical powers of attorney. At various times in the next four years, pursuant to Alston's advice, Anderson also consulted with investment counselors and made investment decisions based on their advice. Two such investment counselors, George Tankard and Steve Currence, testified at trial. In all but two of the Questioned Transactions, including those involving investments, which occurred between 1986 and 1993, Anderson, not her daughter, executed the documents implementing those transactions.

The evidence at trial suggested that Anderson was not a sophisticated business person, but was a person of average intelligence competent to handle her own affairs with the assistance of trained professionals. The misunderstandings between Anderson and Alston eventuated from Anderson's own lack of financial acumen, a similar lack of experience on the

part of her daughter, Fisk, attempts by Anderson and Fisk to independently interpret Anderson's financial records, and their failure to understand explanations afforded by Alston. These misunderstandings, however, were exacerbated by Alston's failure to confirm that Anderson indeed understood certain of the Questioned Transactions which gave rise to this law suit.

## B. *The Questioned Transactions*

In the period between the April Meeting and the late Spring of 1993, Anderson and Alston or her companies participated in the Questioned Transactions which gave rise to this suit. Anderson contends (1) that Alston undertook to act as a fiduciary *vis-à-vis* Anderson by virtue of Alston's agreements to assist Anderson in her financial affairs (as agreed at the April Meeting) and to act in Anderson's behalf pursuant to Anderson's power of attorney; and (2) that Alston violated those fiduciary duties by her conduct with respect to the Questioned Transactions. These transactions are described below.

### 1. *The Deeds of Trust*

#### a. *The 1986 Deed of Trust*

On or about August 1, 1986, Anderson co-signed a second deed of trust note for $35,000.00 evidencing a loan made by First Virginia Bank to Alston's business. Pl. Ex. 13. Anderson agreed to sign the $35,000 note to assist her daughter. The note was secured by a second deed of trust encumbering her residence as security for the loan. In 1988, the outstanding balance of this loan was refinanced with Sovran Equity Corporation.

#### b. *The 1988 Deed of Trust*

On or about October 15, 1988, Anderson and her son executed a promissory note in favor of Sovran Equity Corporation in the amount of $57,979.40, which note was secured by a deed of trust encumbering Anderson's residence. Pl. Ex. 14. The purpose of the loan was to enable Anderson's son, Charles Anderson, to repay approximately $19,000.00 owed by him to the Internal Revenue Service. Because of her acrimonious relationship with her son, Anderson asked Alston to arrange the transaction. Alston prepared the paperwork for Anderson and her son to refinance the 1986 Loan. The $57,979.40 in loan proceeds were advanced (1) to refinance the balance of Alston's loan, and (2) to repay the $19,000.00 required by Charles Anderson to pay his taxes.

In return for the $19,000.00 advance, Charles Anderson agreed to repay his mother the loan proceeds advanced to him and to seek assistance in handling his personal finances. He almost immediately violated both of those promises. Alston thereafter made most of the monthly payments due pursuant to the 1988 deed of trust until June, 1993, thereby repaying both her brother's share of the loan proceeds as well as her own.

Charles Anderson testified at trial that Anderson had forgiven his obligation to repay approximately $60,000.00 owed by him, including the monies borrowed in connection with this transaction.

### c. *The 1990 Deed of Trust*

In 1990, Cheryl Alston asked her mother for further financial assistance for her businesses. Anderson assented. Anderson and Alston each "co-signed" a promissory note payable to Sovran in the amount of $65,000.00, again secured by a deed of trust encumbering Anderson's residence. Pl. Ex. 15. The consideration for the note was (i) the satisfaction of a note (with an outstanding balance of approximately $6,592.00) which predated Frank Anderson's death, and (ii) approximately $58,408.00 in new loan proceeds used by Alston in her business. Alston made payments pursuant to this loan until her mother accused her of fraud in 1993. At trial, no evidence was adduced suggesting that Alston had sought to avoid this liability. She acknowledged her liability for these loan proceeds. A letter introduced by Alston showed that in 1992, she had written her sister recognizing this liability. Pl. Ex. 2.

### 2. *Anderson's Gifts to Alston*

A focal dispute in this case revolves around the nature of a transaction pursuant to which $45,000.00 or $50,000.00 was taken by Alston from Anderson's Pacific Fidelity Security Account and used as a down payment for Alston's purchase of a home. The transfer was accomplished by Alston's use of Anderson's power of attorney.

In her pleadings initiating this cause, Anderson alleged that she had authorized the transfer of her Kidder Peabody funds into the Pacific Fidelity as part of a transaction by which she had intended to make a loan of $100,000.00 to Alston. Motion for Judgment, ¶¶ 12, 13. At trial, however, Anderson testified that she had not known of the transfer until it had been discovered with the assistance of Fisk in 1992 or 1993. She further testified that she had asked Alston about the $100,000.00 missing from her Kidder Peabody account but had received vague replies. Conversely, Al-

ston testified, she had not known that the Pacific Fidelity and other securities had been placed in her name until 1992, when her mother informed her of this fact and stated she had intended to make a gift to Alston.

The evidence at trial established the following facts with respect to this disputed transaction. On May 9, 1987, Anderson met with Steve Currence, an investment advisor, at Alston's office. Anderson made a number of investment decisions, including the transfer of $100,000.00 from her Kidder Peabody account to establish (1) an $80,000.00 Pacific Fidelity Life Insurance Company account, and (2) a $20,000.00 Fidelity Select Portfolios Account. Each account was placed in Alston's name. While Currence knew that Alston had Anderson's power of attorney, each of his discussions had been with Anderson and Anderson had made all decisions with regard to her investments, which he had implemented for her. These investments were originally bought in Anderson's name. Currence further testified that these accounts could not have been placed into Alston's name without Anderson's express authorization. Currence closed his business in 1988. Although apparently not having specific knowledge of what occurred with respect to when and how Alston's name was placed on the Pacific Fidelity and Fidelity Select accounts, he testified that at the time of his retirement, Currence's practice would have been to direct that all of Anderson's account statements be sent to her.

At some point after the opening of the Pacific Security and the Fidelity Select accounts in 1987 and before Alston's exercise of her mother's power of attorney in 1992 to use the funds to buy her house, the accounts were placed in Alston's name.

At trial Alston credibly testified that she learned in 1992 that the Pacific Fidelity account had been placed in her name because a statement for the account had been located by one of her corporate employees. Anderson testified that the account had been placed in Alston's name, pursuant to Alston's suggestion, for an unexplained tax purpose. Although the evidence is inconclusive, the Court finds that it is possible that after Currence closed his office, Alston suggested that statements be sent to Alston's companies, that Anderson agreed, and that Alston failed to recall this circumstance.

In 1992, Alston approached her mother and requested a loan to make a down payment in order to buy a house. Anderson had indicated that she had set aside funds to assist both Alston and her other children; and that Anderson authorized the exercise by Alston of her power of attorney for the withdrawal and use of funds from the Pacific Fidelity account as a

down payment for Alston's purchase of a residence. Pursuant to that authorization, Alston used her mother's power of attorney to transfer $45,000.00 to $50,000.00 of the Pacific Equity funds as a down payment for the purchase of her home. Even after the $50,000.00 transaction was discovered, Anderson took no action to have this money repaid by Alston.

Anderson testified at trial that she had never intended to make either a gift or a loan to Alston. Indeed, she testified that the Pacific Fidelity accounts had been placed in Alston's name for tax purposes and further that she had not learned that the funds had been withdrawn for the purchase of Alston's house until later discovered by Fisk. In support of her testimony that a gift was not intended, she testified that prior to Frank Anderson's death, the Andersons had attempted to give equal amounts to their offspring. Anderson testified at trial that she had intended to continue that practice. She confirmed that she had made numerous loans to Fisk and Charles Anderson, as well as gifts to Alston. No documentation was introduced at trial indicating the nature of these transactions.

### 3. Anderson's Loans to Alston

The evidence adduced at trial demonstrated that Anderson had also made loans to Alston. Alston charged with Anderson's consent $13,000.00 against Anderson's Mastercharge account. Alston received other loans, totalling at least $18,800.00, including many temporary loans which were covered by checks delivered by Alston to Anderson. Pl. Exs. 16, 16.1, 18, 18.1. These transactions were referred to by Anderson as "check trades."

Furthermore, Alston also testified that she had agreed to repay the 1986 and 1990 deed of trust loans but that she had stopped making those payments in 1993 when Anderson would not refinance the deeds of trust securing those loans. Although Anderson introduced checks showing that she made Sovran loan payments and that after June, 1993, she refinanced the deeds of trust encumbering her property, and that she continued to make loan payments pursuant to that refinanced loan, Anderson did not present evidence apportioning those payments between the principal repayments representing the loan funds advanced for Charles Anderson and those representing the advances to Alston.

Anderson testified she had never made demands for repayment of the loans made to Alston.

### 4. *Anderson's Loans to Alston's Companies*

At trial, Anderson presented evidence demonstrating that she had made numerous loans to Alston's companies. On or about June 1987, and July 9, 1988, FREES executed notes payable to Anderson in anticipation of loans to be made by her to the company. Moreover, in a letter from FREES to Anderson, it is stated that with a $10,000.00 loan anticipated in May, 1988 (and made), the total funds borrowed by FREES from Anderson amounted to $40,000.00. This statement was corroborated by checks introduced by Anderson, demonstrating such a series of loans. Pl. Exs. 26, 26.1, 26.6. Other evidence presented by Anderson shows that she made later loans of at least $16,000.00. Pl. Exs. 7, 7.1, 26.2-5. Furthermore, in admissions propounded pursuant to Rule 4.11, Alston admitted that the amount loaned to her companies exceeded $40,000.00. Pl. Ex. 31.

Certain evidence introduced by Anderson suggested that Alston's companies had made some repayments of loans made to them by Anderson.

No evidence was introduced indicating that Anderson did not understand or intend the loans made by her to Alston's companies. Pl. Exs. 29, 29.1.

### 5. *The Aborted 1993 Refinancing*

In 1993, Alston advised Anderson that the rate of interest she was paying on the 1988 and 1990 Deeds of Trust loans was too high and that she should consider refinancing them in order to reduce her interest charges. Since Alston was making the payments on the Sovran deeds of trust, this decision was principally in Alston's best interest. Anderson assented and advised Alston to handle the refinancing.

Alston contacted Benchmark Mortgage, Inc., ostensibly on her mother's behalf. Benchmark's representative, Ross Murphy, reportedly required Anderson to pay down some of her unsecured debt to obtain a better interest rate. At first, it was suggested by Murphy that this might be accomplished by repayment of an outstanding car loan for $8,000.00. Unbeknownst to Anderson, Alston therefore transferred $8,000.00 to an escrow account held by her corporation. Alston used her mother's power of attorney to accomplish this transfer of funds.

Thereafter, Murphy indicated to Alston that Anderson's repayment of her Mastercharge revolving charge debt would better assure the obtainment of an advantageous interest rate. Using her mother's power of attorney, Alston proceeded to write a second check on the Kidder Peabody account in order to transfer an additional $6,000.00 to pay Anderson's

$14,000.00 Mastercharge balance. Although she held her mother's funds in a separate account, Alston sent her own check to Mastercharge to pay off her mother's revolving charge debt. Before Alston's check cleared, however, Anderson learned of the withdrawals of $14,000.00 in funds from her Kidder Peabody account and concluded that the transaction was an attempt to defraud her. Anderson confronted Alston with the fact that she had not specifically authorized the withdrawal of the Kidder Peabody funds and stopped payment on the second $6,000.00 Kidder Peabody check. In the face of these accusations, Alston stopped payment on her check to Mastercharge.

As a consequence of these events, the refinancing of the Sovran deeds of trust was never accomplished. However, the $8,000.00, received by Alston, after cashing the first check written on Anderson's Kidder Peabody account, was never returned by Alston to Anderson.

## III. *Decision*

As Alston's counsel emphasized at trial, this case is a breach of fiduciary duty suit. Anderson has not sought to enforce loan agreements between the parties. Indeed, demands have apparently not been made by Anderson for the repayment of such loans made by her to Alston and her companies.

### A. *The Nicholson Rule*

Anderson's breach of fiduciary duty action is in large part governed by the principles enunciated by the Supreme Court of Virginia in *Nicholson v. Shockey*, 192 Va. 270, 64 S.E.2d 813 (1951). In *Nicholson*, the Court held that when one owes duties to another as a consequence of a fiduciary relationship, any transaction to the benefit of the "dominant party and to the detriment of the other is presumptively fraudulent." *Id.* at 277-78. The Court also held that when such a presumption arises, the burden is on the dominant party to overcome the presumption of constructive fraud by clear and convincing evidence. *Id.* at 282. The Court further observed that such a fiduciary duty will be recognized in the dealings of an agent on behalf of his principal. *Id.* at 278.

The rule adopted in *Nicholson* is not always an easy one to apply. Whenever an adult child undertakes to furnish financial advice to an elderly parent, especially over a period of time, a fiduciary duty on the part of the child toward the parent may be found, and any loan or gift made in favor of that adult child by the parent may be presumed fraudulent, despite

the fact that that child might appear to be the natural object of the parent's generosity. In *Nuckols v. Nuckols*, 228 Va. 25, 320 S.E.2d 734 (1984), the Supreme Court of Virginia grappled with the ramifications of the *Nicholson* rule. It concluded that a son's help from time to time with his mother's finances would not give rise to the presumption of fraud when the mother later conveyed life estates in real property to the son and his wife. *Id.* at 35.

In yet a more recent decision, in *Oden v. Salch*, 237 Va. 525, 379 S.E.2d 346 (1989), the Supreme Court of Virginia re-emphasized that the mere existence of a parent-child relationship does not require a finding of a confidential relationship giving rise to fiduciary duties. However, it nevertheless stressed that "[e]vidence of advice and counsel in business matters involving a certain degree of trust may give rise to such duties, especially where a power of attorney is involved." *Id.* at 535.

It is apparent that this case involves circumstances, such as those in *Nuckols*, of an adult child responding to a parent's request for advice and assistance. Following the death of her husband, Anderson sought the advice of her children, and gratefully received such advice from Alston. On the other hand, it is also apparent that this advice and assistance were so significant in terms of both the magnitude of the transactions involved and the duration of the assistance that a relationship of confidence and trust had developed between Anderson and Alston. The confidential nature of the relationship is confirmed by Anderson's delivery of her power of attorney to Alston in the fall of 1986. Accordingly, this Court finds that a confidential relationship did arise between Alston and Anderson during the period from the April Meeting, in 1986, until the late spring of 1993 when Anderson accused her daughter of fraud. Anderson's gifts and loans to Alston are therefore presumed fraudulent.

This Court recognizes that the *Nicholson* rule gives rise to a sweeping presumption of wrong-doing where innocent, indeed praiseworthy, conduct of an adult child in service of a parent is involved. Accordingly, in determining whether Alston has disproved fraud by clear and convincing evidence, it is clear that the Court must be sensitive that a parent will often wish to demonstrate generosity toward a child, especially one who, like Alston, has provided substantial service and advice in the absence of "self dealing" or any inappropriate conduct. Furthermore, where there is ample evidence that the parent is of advanced years and may be subject to pressures from other children whose interests are not served by a demonstration of such generosity, the Court must likewise be vigilant to determine to

what extent such pressures may have influenced the parent's after-the-fact explanation of the events surrounding earlier generosity. Such nuances are present in this case. Finally, this Court concludes that in considering Alston's evidence to disprove her presumed fraud, each transaction must be viewed both separately and together, to determine whether the child has overcome the presumption of fraud.

## B. *The Credibility of the Witnesses*

In evaluating the testimony presented at trial, the Court emphasizes that Alston's testimony with regard to each Questioned Transaction was precise and generally very credible. Even documents presented at trial by Anderson tended to corroborate Alston's explanation of those Transactions. Alston's testimony was furthermore corroborated in important respects by disinterested witnesses, especially the financial consultants who had assisted Anderson.

In contrast, Anderson's testimony was overly general and often imprecise. More importantly, when carefully analyzed, it seldom specifically contradicted Alston's testimony in important details. During her testimony, Anderson confirmed that she fully understood the loans made to Alston's companies as well as the particulars of those loans secured by the deeds of trust against her residence. Furthermore, the loans and donations were implemented by documents executed by Anderson herself. Indeed, the only serious inconsistency between Anderson's and Alston's testimony is that relating to Alston's use of $45,000.00 of her mother's funds to buy her residence.

The other witnesses testifying at trial in Anderson's behalf were her children, Karen Fisk and Charles Anderson. This Court found that the testimony of both appeared to be embellished. Neither was a disinterested witness. The evidence strongly suggests that Anderson's distrust of Alston and her willingness to assume the worst about Alston's assistance (which she had so recently received with gratitude) was to some extent promoted by Fisk. The evidence presented also suggested that the testimony of both Fisk and Charles Anderson were further motivated by disappointment that they had not been in a position to assist Anderson with respect to her financial affairs and that they had not benefitted equally from their mother's beneficence.

## C. Analysis of Alston's Proof Rebutting Fraud With Respect to the Questioned Transactions

### 1. The Deeds of Trust

Anderson testified that she understood and intended to consummate the transactions giving rise to the 1986, 1988, and 1990 deeds of trust. Anderson herself testified that she understood these transactions. She testified as a competent party capable of handling her affairs. Her description of these transactions did not vary appreciably from the explanation of them provided by Alston.

Anderson's principal complaint with respect to these encumbrances appeared to have been that Alston did not reimburse her for loan payments Alston had received. Although Anderson may be entitled to repayment of some loan payments made by Anderson of those loan proceeds, as the recitation of the facts related to these transactions reflects, Alston has fully sustained her burden of showing that the First Virginia and Sovran loans (and the deeds of trust securing those loans) were fully understood and intended by both parties and were not the product of either a breach of fiduciary duty or fraud.

### 2. Anderson's Gifts and Loans to Alston and her Companies

While the loans and gifts made by Anderson to Alston and her corporations exceeded the amounts of assistance furnished by Anderson to her other children, Anderson's reasons for such disproportionate support are readily discernible from the circumstances during the period in which those loans and gifts were made. Anderson received the benefit of Alston's services on her behalf; Anderson reciprocated and took an interest in Alston's business ventures. Furthermore, as Anderson testified at trial, she wished to make such gifts and loans because Alston and her companies needed her financial assistance. It is therefore wholly natural that Anderson would have chosen to be more generous to Alston than to her other children, despite the fact that Anderson and her deceased husband had had a prior policy to make equal gifts to their children.

Furthermore, as discussed *infra*, for the most part the testimony of both Anderson and Alston coincides with respect to these transactions. There are really only two principal areas of disagreement: (1) loans made to Alston's businesses; and (2) the $50,000.00 gift made to Alston to buy her home.

Anderson alleged that donations made to Alston's companies were the result of a breach of fiduciary duty, but Anderson's own testimony at trial made clear that she intended to make these gifts and they were not the result of any improper conduct by Alston.

First, Anderson contends that Alston breached a duty of investment advice in seeking loans from her in support of Alston's companies. This allegation is wholly unsupported by the evidence. It is clear from the testimony of Mssrs. Tankard and Currence that Anderson knew where to obtain such advice, if necessary. Furthermore in the course of Anderson's own testimony, she affirmatively stated that she intended to make these loans and gifts. Her complaint of nonpayment was only pressed after her misunderstanding as to her daughter's motives related to the aborted 1993 loan refinancing. The evidence advanced by Alston, and corroborated in many respects by Anderson herself, makes it clear that Anderson independently chose to make loans to Alston's companies out of affection for her daughter and out of a genuine interest in the companies themselves. The Court finds that Anderson's real complaint is not that Alston was providing her investment advice tainted by self-interest, but that in hindsight and in the aftermath of the falling-out with her daughter, that she no longer enjoys the use of the monies loaned or donated to Alston's companies.

Second, Anderson initially alleged that she made a loan to Alston in the form of the Pacific Fidelity and Fidelity Select securities. Based upon Anderson's unequivocal testimony at trial that no loan was intended,[1] this Court is left with Anderson's allegation that Alston's exercise of Anderson's power of attorney to obtain funds to make a down payment in purchasing a house was the result of theft.

Anderson's testimony in this respect is wholly belied by the evidence presented at trial. First, she did not plead such a conversion in her motion for judgment. Second, although she contends that the theft was discovered in 1992, she took no affirmative action then to require Alston to restore the funds to her. This allegation appears only to have taken on importance after the aborted 1993 refinancing of Anderson's loans. Third, Alston's

---

[1] The allegation of a loan otherwise appears questionable. No evidence was received as to $100,000.00 lent by Anderson to Alston to enable Alston to buy securities. The court recognizes that Anderson might conceivably contend that paragraphs 12 and 13 of her motion for judgment did not refer to the Pacific Security transaction. If not, however, those allegations appear to refer to no other Questioned Transaction; and the argument of Anderson's counsel never suggested that those allegations involved any other transaction.

testimony of the events giving rise to the gift by her mother were wholly consistent with the circumstances of the parties and were otherwise credible. Anderson had every reason to make such a gift to Alston. Furthermore, Anderson's testimony that she would have been inclined to have made equal gifts to Alston and Charles Anderson is somewhat questionable given Charles Anderson's actions toward his mother after his father's death: he repeatedly showed disrespect for her and verbally abused her; he reneged on promises made to her with regard to the loans advanced from the 1988 refinancing of Anderson's residence; and he otherwise failed to furnish her any filial support in the aftermath of Frank Anderson's death. Fisk was untrained and geographically unable to furnish assistance to her mother. When these and all the evidence related to this Transaction are taken into consideration, this Court concludes that Alston has sustained her burden of showing by clear and convincing evidence that the $50,000.00 advanced from the Pacific Fidelity funds constituted a gift and were not the result of theft. The evidence was unclear, however as to whether the balance of the Pacific Fidelity and Fidelity Portfolio funds were returned to Anderson. Alston's testimony was not sufficient to establish a loan for more than $50,000.00. This Court has reviewed its notes and finds no suggestion that Alston has retained the Pacific Fidelity and Fidelity Select accounts or funds from those accounts. If such evidence was received, Anderson is invited to raise the matter by a motion for reconsideration. In the event there is proof in this record that the balance of those accounts was not returned, Anderson is entitled to a judgment to that extent.

### 3. *The Aborted 1993 Loan Refinancing*

This Court concludes that Alston did not breach fiduciary duties toward her mother by withdrawing monies from Anderson's Kidder Peabody account to accomplish the 1993 loan financing. Although in retrospect it would have been preferable for her to have advised her mother of those withdrawals, Anderson had not only afforded Alston the power of attorney to effect the withdrawals, but had also asked Alston to effectuate the refinancing. Therefore the initial use of the power of attorney did not violate her duties as a fiduciary.

However, while the withdrawal of the Kidder Peabody funds did not constitute a breach of fiduciary duty, Alston's failure to return the $8,000.00 of her mother's funds did. The Court concludes that once the Benchmark refinancing failed, as a fiduciary, Alston had the duty to return

Anderson's funds. Since she failed to do so, Anderson is entitled to judgment in that amount plus legal interest from the time the transaction failed. Although precise testimony was not received as to that date, it is clear that the refinancing had been aborted not later than July 1, 1993. Accordingly, Anderson is entitled to the recovery of a judgment for $8,000.00 plus legal interest from July 1, 1993.