## CIRCUIT COURT OF LOUDOUN COUNTY

Jean Ellen Ray

v.

Frank Jessie Ray

June 19, 1996

Case No. (Chancery) 16943

BY JUDGE JAMES H. CHAMBLIN

The above suit to set aside a deed executed May 2, 1989, and conveying the subject property to the parties as tenants by the entirety, was heard on May 8, 9, 28, and 31, 1996, together with the parties' divorce action (In Chancery No. 16338) (the decision in the divorce action is still under advisement).

After consideration of the evidence and the argument of counsel, the requested relief is denied, and the deed is not set aside.

The Complainant, Jean Ellen Ray ("Jean"), asserts that the subject deed should be set aside because she lacked the required mental capacity to understand the nature and effect of the deed, and because the Defendant, her husband, Frank Jessie Ray ("Frank") exploited their relationship of trust in securing her signature on the deed and is guilty of constructive fraud.

I find that the evidence does not support a finding of lack of mental capacity or of constructive fraud.

The parties were married in 1963. In 1967 Mary B. Compher conveyed to Jean two parcels of land in the Town of Lovettsville, Loudoun County, Virginia. One parcel contains a house in which the parties resided from 1967 until May 1995, when Frank left the marital residence. The other parcel is an adjacent and unimproved lot.

On March 20, 1989, Jean then age 66, suffered a seizure which led to three hospitalizations, as follows:

| Hospital | Admitted | Discharged |
|---|---|---|
| Loudoun Hospital Center (LHC) | 3-20-89 | 3-28-89 |
| Loudoun Hospital Center (LHC) | 3-31-89 | 4-10-89 |
| Frederick Memorial Hospital (FMH) | 4-13-89 | 4-20-89 |

A considerable amount of evidence was presented about the course of her hospitalizations and her condition after her last discharge. She clearly had severe and complex physical problems due to prescription drug withdrawal, hypertension, hypothyroidism, cardiovascular disease, and other conditions. During her first admission, Jean had some psychiatric examinations, but she was never admitted to the Mental Health Unit of LHC or any other psychiatric facility.

On her first admission she was acutely ill from her seizure disorder, and she appeared psychotic. During the first hospital stay, the psychiatrist (Dr. Carol Harkrader) who saw Jean felt she may have been mildly demented and possibly psychotic. After a tour of the LHC Mental Health Unit, Jean and Frank declined admission (see Dr. Raphaelson's 3-28-89 discharge summary).

Although Dr. Raphaelson mentions dementia as a second discharge diagnosis on March 28, 1989, Dr. Keenan in her discharge diagnosis (for the second admission to LHC) on April 10, 1989, does not mention dementia or any other psychological condition. Both doctors show Jean's seizure disorder as the number one diagnosis on both LHC discharges.

Uncontrolled seizures is the number one discharge diagnosis for Jean on April 19, 1989, when she was discharged after the third hospitalization from FMH. Dr. Raphaelson mentions only physical (not mental) diagnoses in his April 19, 1989, discharge summary.

After Jean was discharged from FMH she was unable (by doctor's orders) to drive for a year. Her daughter, Jessie Clark, handled her checkbook and paid her bills. Various members of her family testified that for the period of up to six months after she left FMH, Jean was confused, "just not right," suspicious, not rational, delusional, rambled a lot, unable to conduct her business affairs, "out of it," "like a child," and "easily suggestible."

The hospital records, particularly the first LHC admission record, mention marital problems between the parties. However, Jean testified that in

the spring of 1989 she and Frank argued about something which she could not recall, but otherwise the marriage "seemed just fine." She put on considerable evidence that after her hospitalization in 1989 and up to Frank's leaving the marital residence in May 1995 they did the normal things of a husband and wife. She testified that she was shocked in January 1995 when Frank first mentioned a divorce to her.

Jean has no recollection of most of the events surrounding her hospitalizations. For a period of at least two weeks after her release from FMH someone was with her twenty-four hours a day.

Sometime after Jean was first hospitalized, Frank saw James Campbell, an attorney, and had a deed prepared conveying the two parcels from Jean to the two of them as tenants by the entirety with the right of survivorship as at common law. Jean does not know, and she never saw or talked to, Mr. Campbell. The deed had the date of March typed in, but March was crossed out when the deed was executed on May 2d. The deed was prepared in March. Frank saw Mr. Campbell during Jean's first hospitalization at a time when Jean was at her worst physically and mentally, but Frank did not request Jean to sign the deed until after her last hospitalization.

On May 2, 1989, during a time when Frank was with Jean, she signed and acknowledged the deed before a notary public. It was recorded on June 13, 1989.

Jessie Clark testified that Jean did bring up the deed with her before it was signed and that Jean was unsure what to do about it. Other family members were aware of the deed before it was signed. Jean's son, William Napoli, testified that he was concerned for his mother's physical health because Frank was "badgering" Jean to sign the deed.

Dr. Grace Keenan a board certified internist, has treated Jean since March 1989. Dr. Keenan testified extensively about Jean's condition on her first admission to LHC, her course of treatment during the two LHC hospitalizations, and her care of Jean after she left FMH. Dr. Keenan did not care for Jean when she was at FMH.

According to Dr. Keenan, Jean was a "complex case." It did take a team of physicians and time for Jean to get better. During Jean's first hospitalization, Dr. Keenan did request neurological and psychiatric consultations for her. Dr. Harkrader did see Jean, and she recommended that, once Jean was stabilized, she come to the LHC Mental Health Unit. Jean was never admitted to the mental health unit.

Dr. Keenan expressed an opinion that on May 2, 1989, Jean did not have the capacity to understand a real estate transaction.

Regardless of how Dr. Keenan wanted to characterize Jean's condition in the spring of 1989, Jean's physical problems were much more severe than her mental problems. Jean had, just prior to her first hospitalization, stopped completely her self-medication of prescription drugs from different doctors. For years, she had been taking drugs such as valium and tylenol 3 for anxiety and her other physical ailments. The doctors ultimately determined that the drug withdrawal led to the seizure disorder. By the end of the third hospitalization, the seizures were under control. Jean had no seizures after she left FMH on April 19, 1989.

Dr. Keenan did notice some psychological problems with Jean when she saw her on May 1, 1989 (the day before the deed was signed). She did refer Jean to a psychiatrist because of anxiety, depression, and difficulty in sleeping. Jean did see a psychiatrist, but there was no evidence of her course of treatment with the psychiatrist except that some anti-depressant drugs were prescribed.

### *Lack of Mental Capacity*

The law is well settled in a suit to set aside a deed on the ground of mental incapacity. Every person is presumed to be of sound mind and to be mentally competent to enter into a contract or a deed. The burden is upon the party alleging lack of capacity to establish it by clear and convincing evidence. *Brown* v. *Resort Developments*, 238 Va. 527, 529 (1989); *Drewry* v. *Drewry*, 8 Va. App. 460, 469 (1989).

The test for determining if one has sufficient capacity to become bound by a contract or a deed is whether, at the time the instrument was executed, the person had sufficient mental capacity to understand the nature of the transaction and to agree to its provisions. *Brown*, 238 Va. at 529.

Jean knew and understood the nature of the deed before she signed it. She talked about it with her daughter. There was no evidence that Jean did not understand the effect of the deed. Even though Jean has no recollection of signing the deed, she did acknowledge that she may have discussed the deed with Frank before she signed it. Jean discussed the deed and its effect with others after it was signed. There was no evidence of any effort by Frank to conceal the execution of the deed.

There was no evidence that Jean had any condition that would affect her mental capacity before the seizure of March 20, 1989. Considerable evidence was presented as to why the parcels were conveyed only to Jean in

1967. Before May 2, 1989, Jean knew what a deed was, what it could do, that the property could be placed in both names with survivorship and that if it were, then it would pass by deed to the survivor upon the death of the first of them. No evidence was offered by Jean that on May 2, 1989, that she would have had any other desire than to see that the parcels would pass to Frank at her death. Jean's evidence was that the property was conveyed to her in 1967 because Frank wanted it that way.

This is not a case of bad reasoning or an ill-advised decision by Jean. Nothing was offered to contradict a natural desire of spouses in the absence of marital problems, when one becomes ill and faces disability or even death, to see that the property of the ill spouse will pass on death to the other spouse with the least difficulty. Jean offered no evidence that she was always adamant that the property remain solely in her name. Frank testified that he had talked to Jean about conveying the property to them with survivorship before March 1989, and that Jean never refused, but just wanted to do it later.

Although there are references to marital problems in Jean's medical records, neither she nor her witnesses, particularly her children and her sister, offered any testimony about marital problems in the spring of 1989. If Jean had been "under a lot of pressure at home" or "had difficulty with her husband over at least several years" as recited in the admission notes of LHC from March 20, 1989, then why did she not testify about such pressure or difficulty at trial? She offered no evidence that she had any difficulty recollecting what had occurred before March 20, 1989.

Jean asserts that Frank felt the parties were separated when the deed was signed because he told his attorney at their first visit in January 1995 that the parties had separated in December 1988. This separation date was put in the property settlement agreement prepared by Frank's attorney and sent to Jean in early March 1995. But during the course of this litigation Frank has asserted other dates of separation, namely, on June 2, 1989, and in November 1994. Frank acknowledged at trial that all three dates were in error. The multiple separation dates do not show deception on Frank's part, but a lack of an understanding of the significance of a date of separation.

The evidence clearly supports several facts that have a bearing on the date of separation. The marital residence has only two bedrooms. Until October 1990 when she remarried and moved several houses away, their daughter, Jessie Clark, lived at home and used one bedroom. The parties had to have used the other bedroom while their daughter lived at home. Frank offered no evidence of a separation under the same roof except for

Jean's sleeping alone in the other bedroom. She could not have done that until on or after October 1990.

Assertions do not make facts. It is not an estoppel situation. There is no burden on Frank to prove the validity of the deed. He has the benefit of the presumption of capacity. Jean has the burden to prove lack of capacity. The overwhelming evidence is that the parties could not have separated under any theory until October 1990 at the earliest.

The crucial period of time for purposes of determining Jean's mental capacity is when the deed was signed. Her capacity before and after executing the deed are relevant evidence to determine capacity, but the dispositive question is her capacity at the time she signed the deed. *Drewry*, 8 Va. App. at 467.

Evidence of one's mental capacity usually comes from the following: (1) lay witness acquainted with the person; (2) opinions of doctors who have treated or examined the person; and (3) witnesses who observed the person negotiate or sign the instrument. *Drewry*, 8 Va. App. at 467.

There was considerable testimony of lay witnesses who knew Jean about her condition before and after she executed the deed. But not one of them observed Jean when she signed the deed.

Dr. Keenan was the only doctor to express an opinion about Jean on May 2, 1989. But her opinion was that Jean did not have the capacity to understand a real estate transaction. Her opinion was not specific to exactly what Jean did. A real estate transaction can range from relatively simple to extremely complex. Jean certainly had prior knowledge about real estate and survivorship. The real issue is not about the intricacies of a real estate transaction as much as it is about placing the property in a posture so that (1) Frank is an owner with Jean and (2) it is held with survivorship. There is no issue of Jean's giving all her interest in the property to Frank.

When asked, Dr. Keenan narrowed her reasons for recommending psychiatric treatment to Jean on May 1, 1989, to her anxiety, depression, and inability to sleep. Merely having these conditions should not render a person without the capacity to execute a deed. The *DiPietro* case from Ohio cited in *Drewry* indicates that severe mental depression alone does not render a person legally incompetent. *Drewry*, 8 Va. App. at 469.

The only person who testified about Jean's condition when the deed was executed was Frank. He testified that Jean knew what she was doing when she signed the deed. He did admit that she was "sick" and in an "unstable condition," but he also testified that he never worried about Jean's mental

health. Furthermore, Dr. Keenan never told Frank that Jean lacked the mental capacity to execute the deed.

This case is unusual in the paucity of testimony concerning the actual signing of the deed by Jean. Her signature is acknowledged by a notary public, but the notary public was never called as a witness. No explanation was given as to why the notary public did not testify. Frank testified that he thought there was another person present when the deed was signed, but he could not recall who it was. There was no direct evidence of where the deed was signed. There was no evidence of how it came to be recorded.

The lack of testimony from the psychiatrist who saw Jean at or shortly after the time the deed was executed and the lack of any testimony from the attorney who prepared the deed does not tend to support Jean's position. Her inability to recollect signing the deed is not dispositive. Mrs. Drewry did not remember executing the property settlement agreement in *Drewry*, but the agreement was still held valid. *Drewry*, 8 Va. App. at 466.

Jean did not object to the deed until after Frank filed for the divorce suit. This suit to set aside the deed was filed on March 28, 1996. Frank had filed for the divorce suit on May 4, 1995. Capacity at the time the deed was signed is determinative, but a failure to object for almost seven years, at least, infers that she did understand the nature of the deed. Jean offered no evidence that she asked any questions about the deed or its effect between May 2, 1989, and March 28, 1996.

The presumption of sound mind and mental capacity has not been overcome. I do not have a firm belief or conviction that Jean lacked mental capacity to understand the nature of the deed and its consequences when she signed it on May 2, 1989.

### Constructive Fraud

Jean also argues that the deed should be set aside because Frank is guilty of constructive fraud.

Constructive fraud is "a breach of legal or equitable duty which, irrespective of moral guilt, is declared by law to be fraudulent because of its tendency to deceive others or violate confidence." *Wells* v. *Weston*, 229 Va. 72, 77 (1985). One alleging constructive fraud must show it by clear and convincing evidence. *Derby* v. *Derby*, 8 Va. App. 19, 26 (1989).

Stated in terms of its elements, constructive fraud consists of: (1) a material false representation, (2) that the hearer believed to be true, (3)

that was meant to be acted upon, (4) that it was acted on, and (5) damage was sustained. *Nationwide Ins. Co.* v. *Patterson*, 229 Va. 627, 629 (1985).

The duty by which conduct is measured to determine fraud is established by the relationship and circumstances which exist between the parties. *Drewry*, 8 Va. App. at 469. If a husband and wife are not estranged, then there is the highest fiduciary duty of trust upon the husband in dealing with his wife. He also has a duty not to exploit their confidential relationship. *Drewry*, 8 Va. App. at 470.

For reasons stated above, the parties were not estranged or separated at the time Jean executed the deed. Therefore, Frank owed her the highest duty to protect her financial interests.

Jean argues that Frank failed to disclose to her on May 2, 1989, that he considered the marriage to be severed and that he intended to terminate the marriage. If she had known his true intentions, then she would never have signed the deed. I disagree with her position. I do not have a firm belief or conviction that Frank considered the marriage severed or intended to terminate it on May 2, 1989. There was no material false representation.

Frank's multiple assertions of different separation dates have been discussed above. His assertion that the parties separated in December 1988 is not dispositive. Neither are the marital difficulty references in the medical records for reasons stated above.

Jean presented a considerable amount of evidence that the parties continued to live as husband and wife, doing all the things of a normal marriage, from May 1989 into 1995. Her position, which is supported by the evidence, is that Frank left on May 2, 1995 (six years to the day after the deed was signed).

Frank is about seventeen years younger than Jean. They had married in 1963 when she was forty-two and he was twenty-four years of age. They had lived together in and jointly maintained the property for almost twenty-two years when the deed was signed. The parties were not separated or estranged; therefore, it is more probable that when Jean became ill both parties would have wanted the marital residence placed in both names with survivorship. Both parties would have wanted the marital residence to pass to the survivor. There was no evidence otherwise. Frank cannot be criticized for wanting to make sure that his home for the prior 22 years would pass to him if Jean were to die. It is not as if Jean were induced to give an interest in the property to some person she hardly knew. The parties' marital problems came much later. What Frank did in May 1989 was a logical reaction under the circumstances to Jean's illness. Jean

felt that way also until the marriage deteriorated and she became involved in divorce litigation.

Frank did not exploit his confidential relationship with Jean. There was no constructive fraud.

For all the reasons stated above, the deed is not set aside.