**LEGAL SERVICES CORPORATION,**
**Plaintiff,**

v.

**CLIENT CENTERED LEGAL SERVICES OF SOUTHWEST VIRGINIA, INC., Defendant.**

No. 1:01CV00038.

United States District Court,
W.D. Virginia,
Abingdon Division.

Aug. 14, 2002.

Francis H. Casola and R. Lucas Hobbs, Woods, Rogers & Hazlegrove, P.L.C., Roanoke, VA, for Plaintiff.

Gerald L. Gray, Gerald Gray Law Firm, Clintwood, VA, for Defendant.

## OPINION

JONES, District Judge.

In this dispute between Legal Services Corporation and its former grantee over the disposition of an office building purchased in 1982 by the grantee with grant funds, I find that the grant assurances allow Legal Services Corporation the right to direct the use and disposition of the property now that the grantee has lost its grant status, even though the original purchase documents did not refer to any such right. Accordingly, I grant summary judgment and impose a constructive trust on the property for the benefit of Legal Services Corporation.

### I

The plaintiff, Legal Services Corporation ("LSC"), is a nonprofit organization established by Congress to provide financial assistance to legal aid programs designed to assist eligible clients. *See* 42 U.S.C.A. § 2996e(a)(1)(A) (West 1994). The defendant, Client Centered Legal Services of Southwest Virginia, Inc. ("CCLS"), is a nonprofit corporation established to provide legal services to indigent clients in Southwest Virginia. CCLS applied for and began receiving funding from LSC in 1979. In 1982, CCLS used such funds to purchase and renovate certain real estate known as the "Phillips property" in Castlewood, Virginia, to use as its offices.

CCLS continued to receive grants from LSC until 2000, when CCLS lost a grant competition to another legal services organization. When CCLS lost its grantee status, LSC directed CCLS to vacate the Phillips property and transfer it to the new grantee. CCLS refused, and continues to occupy the premises. LSC instituted the present action on April 20, 2001, in order to resolve this dispute.[1] LSC contends

1. LSC is organized under the laws of the District of Columbia with its principal place

that it is entitled to direct the use and disposition of the property in question because CCLS has lost its grantee status. CCLS in turn claims that LSC has no such right.

Following discovery, the parties filed cross motions for summary judgment, which have been briefed and argued. The essential facts of the case, based on the summary judgment record, are as follows.

As part of its grant application each year, CCLS was required to make certain assurances to LSC regarding the use of the grant monies it received.[2] The applications, signed by CCLS representatives, state that "I have read the attached assurances and understand that if this application is approved for funding, the grant will be subject to these assurances. I certify that the applicant will comply with these assurances if the application is approved." (McDiarmid Dep. Exs. 12–14.) Paragraph 12 of the attached assurances contains the following language:

> If this grant is terminated before its expiration date, or if applicant ceases to be a grantee of the Legal Services Corporation after the expiration of this grant, applicant hereby gives assurance that it will follow the Corporation's directions with respect to the use or dispo-

of business in Washington, D.C. CCLS is organized under Virginia law and maintains its principal place of business in Virginia. Jurisdiction of this court thus exists pursuant to 28 U.S.C.A. § 1332(a) (West 1993 & Supp.2002) in that the parties are citizens of different states and the amount in controversy exceeds $75,000. The property that is the subject of this action has recently been appraised at a value of $131,000.

**2.** CCLS admits that it agreed to the LSC assurances for the grant years 1979 through 1982. LSC represents that this agreement was required every year that CCLS applied for grant money, which would include the years 1983 through 2000. Only the grant assurances for the years 1979 through 1982

sition of fund balances, records, and any equipment, supplies, or property purchased with grant funds.

(*Id.*) All funds granted to CCLS were subject to these conditions, even supplemental funds that may have been provided during a grant year.[3]

In 1982, CCLS decided to use surplus LSC funds to purchase and renovate an office building for its use. To do so, however, CCLS first needed to obtain permission from LSC to use LCS funding for that purpose. As part of the approval process, CCLS's executive director, Hugh O'Donnell, wrote a letter to LSC on April 2, 1982, which explains the need for new offices, describes the Phillips property, and sets forth CCLS's strategy for the purchase and renovation of that property. The letter states in part:

> 4. *Disposition of Property*
>
> We agree not to dispose of the new property without first obtaining the approval of the Legal Services Corporation as to the disposition of the property and of the proceeds. See the attached memorandum of law of the rights of the Legal Services Corporation to retain control over a subsequent transfer of property.[4] See also the attached Reso-

are contained in the record. In 1983, the grant assurances were published in the Federal Register. *See* General Assurances as Conditions for Approval of Grant, 48 Fed.Reg. 51,715 (Nov. 10, 1983).

**3.** Letters from LSC to CCLS awarding supplemental funds contain the statement: "All terms, conditions and assurances of your previous grant will remain in effect." (McDiarmid Dep. Exs. 15, 16.)

**4.** The memorandum referred to in this paragraph was prepared by a law student working with CCLS's senior staff attorney. The memorandum summarized the legal principles as to restrictions on alienation of property and concluded that LSC could retain control over

lution passed by the CCLS Board of Directors relating to the LSC's interest in all CCLS-owned property.

(McDiarmid Dep. Ex. 2 at 9.)

The board of directors resolution described in the letter is dated April 7, 1980. It states in part that:

in the event that CCLS ceases to be a grantee of the Legal Services Corporation, the Board of Directors of CCLS hereby recognizes the paramount interest of the Legal Services Corporation in all assets purchased with Legal Services Corporation funds and agrees to seek prior advice and approval from the Legal Services Corporation as to the sale, transfer or other disposition of any such asset.

(McDiarmid Dep. Ex. 5.)

CCLS also provided to LSC an Agreement as to Disposition of Property, dated April 9, 1982, and signed by O'Donnell and CCLS's chairman of the board of directors. In this agreement, CCLS states that it "will not sell, encumber, or otherwise dispose of any interest in the property known as the 'Phillips property ...' without the advance written approval of the Legal Services Corporation." (McDiarmid Dep. Ex. 6.) It further notes that CCLS made the agreement in consideration of LSC's approval of the use of grant funds to purchase the property. Along with the other submitted documents, CCLS also gave LSC a copy of the purchase agreement and an appraisal of the property. The only parties to the purchase agreement are the sellers, the broker, and CCLS, as represented by O'Donnell.

On April 15, 1982, LSC notified CCLS that it had approved the use of grant money to purchase the Phillips property. In its letter, LSC states that it based its decision on the documents that CCLS had provided and that it had relied upon the commitments made in O'Donnell's April 2, 1992 letter. The letter from LSC reminds CCLS that the property "is not to be sold, incumbered, or used for any other purpose without the advance written consent of the Legal Services Corporation." (McDiarmid Dep. Ex. 8 at 1.) Legal title to the property was conveyed to CCLS, and the deed to the property contains no reference to LSC or any right that it might have to the property.[5]

LSC's grantees were required to submit financial statements each year to LSC, and in an effort to guide grantees in this endeavor, LSC prepared an Audit and Accounting Guide for Recipients and Auditors, which sets forth the applicable accounting and reporting procedures. In this guide, LSC explains that "[i]n many cases, funding sources maintain a reversionary interest in property purchased with its funds. Simply stated, a reversionary interest requires that property, or the proceeds from the sale of such property must be returned to the appropriate funding source if at some future date funding of the recipient is terminated." (Couch Dep. Ex. 26 at 2–6.)

Since at least 1982, CCLS has submitted financial statements to LSC that contain the following language:

D. PROPERTY, PLANT, EQUIPMENT AND LAW LIBRARY—Property, plant, equipment and law library ac-

subsequent transfers of the property without conflicting with those principles.

**5.** There is evidence that it was the policy of LSC that when a grantee purchased real estate with LSC funds, "[t]itle must be taken in a way that will insure reversion to [LSC] in the event that the program ... ceases to receive financial assistance from [LSC]...." (McDiarmid Dep. Ex. 1.) Nevertheless, the deed is silent on that subject.

quired with LSC funds are considered to be owned by CCLS while used in the program or in future authorized programs. However, LSC retains a reversionary interest in these assets as well as the right to determine the use of any proceeds from the sale of such assets. (Couch Dep. Ex. 31 at 5.) The audit reports were LSC's method of tracking how CCLS spent the grant money each year. CCLS's board of directors reviewed and approved these annual audit reports, and the directors never questioned or objected to the reversionary interest language.

In early 2000, LSC introduced a new grant award process, based on an enlarged geographical area. CCLS unsuccessfully sued LSC and its employee, John Eidleman, to challenge this grant competition. *See O'Donnell v. Eidleman,* 2001 WL 708373, 12 Fed.Appx. 180 (4th Cir.2001) (unpublished) (holding that federal courts lacked jurisdiction to review the actions of LSC). According to CCLS, Eidleman assisted the legal services organization that later won the grant competition. It is undisputed that Eidleman was involved in the competition as an LSC employee. He reviewed the grant applications, helped perform onsite evaluations of the competitors, and prepared a written recommendation report that was submitted to a panel of independent reviewers who made the final decision to award the grant.

As of December 31, 2000, CCLS was no longer an LSC grantee. Despite demands by LSC, CCLS has refused to vacate the Phillips property. LSC filed this lawsuit asserting a "reversionary interest" [6] in the property and claiming that CCLS has been unjustly enriched by retaining property that was purchased with federal grant money. LSC asks the court to declare the rights of the parties, impose a constructive trust on the property for the benefit of LSC, and order CCLS to vacate and transfer the property as directed by LSC.[7]

CCLS denies that LSC is entitled to any relief. It contends that the documents involved in the purchase of the Phillips property do not support the right that LSC is now asserting since CCLS is not attempting to sell or dispose of the property itself. In addition, CCLS alleges several affirmative defenses, including the rule against perpetuities, the statute of frauds,

---

**6.** The plaintiff agrees that it does not use the term "reversionary interest" as a word of art from the law of real property. Technically, a reversionary interest is "an interest in land arising by operation of law whenever the owner of an estate grants to another a particular estate, e.g., a life estate or a term of years, but does not dispose of the owner's entire interest." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 770 (2d ed.1995). Rather, the plaintiff uses the term to indicate that LSC has a beneficial or contractual interest in the Phillips property based on the agreements and assurances made by CCLS in relation to its use of LSC funds to purchase the property.

**7.** In its initial Complaint, LSC also asserted claims for money damages and for ejectment, but has requested by letter dated July 2, 2002, that it be allowed to dismiss without prejudice any such claims. CCLS objects to any dismissal without prejudice. It is apparent that LSC's motion was motivated by the tactical decision to leave only equitable causes of action in this case, thus removing the necessity for a jury trial. Where a plaintiff seeks to dismiss certain claims, while retaining others, the court must consider the standards evolved from Federal Rule of Civil Procedure 41(a)(2), relating to voluntary dismissal of an action. *See Skinner v. First Am. Bank of Va.,* 1995 WL 507264, at *2, 64 F.3d 659 (4th Cir.1995) (unpublished). "The purpose of Rule 41(a)(2) is freely to allow voluntary dismissals unless the parties will be unfairly prejudiced." *Davis v. USX Corp.,* 819 F.2d 1270, 1273 (4th Cir.1987). In view of my decision granting the plaintiff's motion for summary judgment, it is clear that the defendant will not be prejudiced by the voluntary dismissal of these claims, and I will grant the request.

laches, the merger doctrine, and unclean hands.

## II

Summary judgment is appropriate when there is "no genuine issue of material fact," given the parties' burdens of proof at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see* Fed.R.Civ.P. 56(c). In determining whether the moving party has shown that there is no genuine issue of material fact, a court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *See Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Id.* at 327, 106 S.Ct. 2548.

■ A federal court exercising diversity jurisdiction must apply the law of the state in which it sits. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 78–79, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Virginia is said to follow "traditional" contract choice of law principles. *See Fuisz v. Selective Ins. Co. of Am.,* 61 F.3d 238, 241 (4th Cir.1995). The general rule is that the nature, validity, and interpretation of a contract is governed by the law of the place where it was made, unless there is an express intention to the contrary. *See Lexie v. State Farm Mut. Auto. Ins. Co.,* 251 Va. 390, 469

S.E.2d 61, 63 (1996); *C.I.T. Corp. v. Guy,* 170 Va. 16, 195 S.E. 659, 661 (1938). The place of contracting is where the final act necessary to make the contract binding occurs. *See Chesapeake Supply & Equip. Co. v. J.I. Case Co.,* 700 F.Supp. 1415, 1417 (E.D.Va.1988). The parties do not dispute that Virginia law applies in this case.

■ This case centers on whether there exists a binding contractual agreement requiring CCLS to give up the Phillips property in the event CCLS loses its federal funding. Three elements are required for the formation of a contract—offer, acceptance and consideration. *See Montagna v. Holiday Inns, Inc.,* 221 Va. 336, 269 S.E.2d 838, 844 (1980). "Mutual assent by the parties to the terms of a contract is crucial to the contract's validity." *Wells v. Weston,* 229 Va. 72, 326 S.E.2d 672, 676 (1985). The manifestation of assent is completed when one party makes an offer and the other party accepts that offer. *See* 1 Williston on Contracts § 4:3 (4th ed.1990).

■ The specific documents that resolve the issue in this case are the grant assurances. LSC offered to supply grant money to CCLS in exchange for CCLS's promise to abide by the grant assurances. This simple offer and acceptance creates a manifestation of assent, which is judged by overt acts and words, and not by any subjective intent of the parties. *See Lucy v. Zehmer,* 196 Va. 493, 84 S.E.2d 516, 522 (1954). The overt words of CCLS are that it "will comply with [the] assurances." (McDiarmid Dep. Exs. 12–14.) The assurances state that "if the applicant ceases to be a grantee ... it will follow [LSC's] directions with respect to the use or disposition of ... property purchased with grant funds." (*Id.*) It is clear from the language of the signed grant application and the incorporated grant assurances that

CCLS accepted the grant money and promised to follow the rules set forth in those assurances. The contract covers the use of any and all grant money received by CCLS, and by its plain language includes the funds used to purchase the Phillips property. Thus, CCLS is bound by its contract and must follow LSC's instructions with respect to the use or disposition of the property, now that it no longer enjoys grantee status. LSC has demanded that CCLS vacate the property and dispose of it as directed by LSC. Under its contract, CCLS is obligated to do so.

CCLS argues that the grant assurances were not part of the agreement as to the purchase of the property in 1982. It contends that the binding contract in this case consists solely of the eight specific purchase documents[8] and the LSC approval letter dated April 15, 1982 ("the transaction documents"), none of which creates a right that would permit LSC to determine the use and ownership of the property if CCLS ceased to be an LSC grantee. It asks the court to construe the grant assurances as an agreement separate and apart from the specific transaction that took place with respect to the property in 1982. What CCLS fails to recognize, however, is that the grant assurances create an obligation on the part of CCLS with respect to any property purchased with grant funds received from LCS. The Phillips property was purchased with grant funds; therefore, CCLS's obligation exists with respect to that property. The fact that separate documents were executed with respect to

the 1982 transaction does not alter that obligation because there is nothing in those documents that is inconsistent with the language found in the grant assurances. The more general provision included in the grant assurances cannot be trumped by the specific language of the transaction documents because they do not conflict. *See Bott v. N. Snellenburg & Co.*, 177 Va. 331, 14 S.E.2d 372, 375 (1941).

■ In fact, the grant assurances and the transaction documents address different aspects of the disposition of the property. The grant assurances relate to CCLS's obligations with respect to the property should it lose its grantee status, and the transaction documents relate to CCLS's responsibilities should it decide to sell or otherwise dispose of the property. The grant assurances and the transaction documents should therefore be read together. *See Countryside Orthopaedics, P.C. v. Peyton*, 261 Va. 142, 541 S.E.2d 279, 284 (2001) (" 'Where a business transaction is based upon more than one document executed by the parties, the documents will be construed together to determine the intent of the parties ....' " (citations omitted)). I thus find that CCLS is required to follow the direction of LSC with respect to the use and disposition of the property in question.[9]

■ CCLS asserts several affirmative defenses in this case, none of which is viable. The statute of frauds defense does not apply because the grant assurances

---

8. These eight documents are: (1) the appraisal report on the property; (2) a board resolution approving the purchase; (3) the memorandum of law on restraint on alienation; (4) the purchase agreement; (5) O'Donnell's analysis of the economic merits of the purchase; (6) O'Donnell's letter dated April 2, 1982; (7) the board resolution dated April 7, 1980; and (8) the Agreement as to Disposition of Property, dated April 9, 1982.

9. Following oral argument in this case, CCLS has submitted as additional documents letters from LSC after the present dispute arose in which LSC does not rely on the grant assurances as support for its rights to the property. However, those letters do not prevent LSC from relying on the legal arguments it now makes.

are in writing and CCLS's acknowledgment of those assurances is signed. *See* Va.Code Ann. § 11–2 (Michie 1999). CCLS's argument that laches bars LSC from asserting its rights as to the property is not valid because it was not until CCLS lost its grantee status in 2000 and refused to vacate the property that a dispute arose between the parties. Until that time, LSC had every reason to believe it maintained its rights in regard to the Phillips property based on the grant assurances and the eighteen years of audit statements submitted by CCLS that indicated LSC had a "reversionary interest" in all such property. The merger doctrine defense also has no merit because, as the plaintiff points out, the agreement to purchase the property from the owners is a separate agreement from the grant assurances established with LSC. The agreement as to what would happen if CCLS lost its grantee status was collateral to the deed and thus would not be merged. *See Beck v. Smith,* 260 Va. 452, 538 S.E.2d 312, 314 (2000).

CCLS asserts an unclean hands defense based on its assertion that the LSC grant competition was "rigged and corrupt." (O'Donnell Dep. at 103.) However, the defendant has not presented any evidence to support its claim that there was a conspiracy between the successful grantee and LSC to undermine CCLS. Furthermore, the fact that Eidleman was a defendant in CCLS's prior lawsuit against LSC raises no viable factual issue of improper conduct or conflict of interest.

### III

I find that there is no genuine issue of material fact in this case, and thus it is an appropriate case for summary judgment. For the reasons stated above, I find that there was an agreement in effect at the time CCLS purchased the Phillips property that CCLS, should it cease to be a grantee, would follow LCS's directions with respect to the use or disposition of all property purchased with grant funds. Now that CCLS no longer receives federal money from LSC and has refused to vacate the property despite LSC's demands that it do so, CCLS is in material breach of that agreement. I will therefore grant the plaintiff's motion for summary judgment.

■■■■■ As a remedy for CCLS's breach of contract, LSC requests that the court impose a constructive trust upon CCLS. The purpose of a constructive trust is to prevent a failure of justice. *See Richardson v. Richardson,* 242 Va. 242, 409 S.E.2d 148, 150 (1991). A constructive trust can be created where property " 'has been fairly and properly acquired, but it is contrary to the principles of equity that it should be retained, at least for the acquirer's own benefit.' " *Leonard v. Counts,* 221 Va. 582, 272 S.E.2d 190, 195 (1980) (citations omitted). Because I find that CCLS's current use of the Phillips property is a material breach of its agreement with LSC and contrary to the principles of equity, I will regard CCLS as a constructive trustee of the property for the benefit of LSC and compel CCLS to follow LSC's directions as to the use and disposition of the property.